LOS ALAMOS SCHOOL BOARD,
Plaintiff-Appellee,

v.

Harry WUGALTER, Chief of the Public School Finance Division of the Department of Finance and Administration, Vince Montoya, Director of the Department of Finance and Administration, Leonard J. Delayo, Superintendent of Public Instruction of the State of New Mexico, Jesse D. Kornegay, State Treasurer of the State of New Mexico, Defendants-Appellants.

No. 75–2000.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Nov. 16, 1976.

Decided May 31, 1977.

Rehearing Denied July 27, 1977.

Jeff Bingaman of Campbell & Bingaman, Santa Fe, N. M., for appellants.

Richard C. Minzner of Rodey, Dickason, Sloan, Akin & Robb, Albuquerque, N. M., (on the brief Robert L. Schwartz, Albuquerque, N. M.), for appellee.

Before LEWIS, Chief Judge and BARRETT and DOYLE, Circuit Judges.

LEWIS, Chief Judge.

Plaintiff school board brought this action in United States District Court for the Dis-

trict of New Mexico challenging one subsection of the New Mexico Public School Finance Act [1] on the ground it conflicts with the Atomic Energy Community Act of 1955 ("AECA"), 42 U.S.C. §§ 2301–94, and is therefore unconstitutional under the supremacy clause, U.S. Const. art. VI, cl. 2. The defendants are the responsible New Mexico education officials. The district court entered judgment for plaintiff declaring subsection 19(G) unconstitutional and ordering defendants to fund the school district under the general funding formula applicable to all other school districts.

Los Alamos, New Mexico, was originally established by the federal government as one of three federally-owned communities to house employees and their families who were involved in atomic energy research. In 1955 Congress approved legislation, the AECA, providing for the gradual termination of government ownership and management of two of these communities, Oak Ridge, Tennessee, and Richland, Washington. Los Alamos was included in this legislation in 1962.

The federal government transferred without cost the public schools it had built to the newly-created Los Alamos School District. The federal government originally through the Atomic Energy Commission and now through the Energy Research and Development Administration (ERDA), however, continued to make assistance payments to the school district pursuant to 42 U.S.C. §§ 2391–94. These payments to the school district have averaged more than two million dollars annually. In 1974 the school district received more than $2.4 million from the federal government in AECA funds.

Prior to 1974 New Mexico gave money to local school districts including Los Alamos to assist them in financing public education. Under this plan Los Alamos received about $2.3 million from the state for the 1973–74 school year. In 1974 the Public School Finance Act was amended in an attempt to equalize educational expenditures and opportunities state-wide. This general "equalization funding formula" is now codified in N.M. Stat. Ann. §§ 77–6–19(A)–(F) (Supp.1975).[2] This general formula applies

1. N.M. Stat. Ann. § 77–6–19(F) (1953). Since entry of judgment by the district court the New Mexico Public School Finance Act has been amended and the challenged subsection is now codified as N.M. Stat. Ann. § 77–6–19(G)(Supp.1975). The challenged subsection will be referred to as subsection 19(G) in this opinion.

2. These subsections provide:
    A. The state equalization guarantee distribution is that amount of money distributed to each school district to ensure that the school district's operating revenue, including its local and federal revenues as defined in this section, is at least equal to the school district's program cost.
    B. "Local revenue" as used in this section means ninety-five per cent [95%] of receipts to the school district derived from the following:
    (1) that amount produced by a school district property tax at the rate of eight dollars ninety-two and one-half cents ($8.925) per one thousand dollars ($1,000) of net taxable value of property allocated to the school district; and

(2) the school district's share of motor vehicle fees distributed in accordance with section 77–6–35 NMSA 1953.
    C. "Federal revenue" as used in this section means ninety-five per cent [95%] of receipts to the school district derived from the following:
    (1) the school district's share of forest reserve funds distributed in accordance with section 77–6–35 NMSA 1953;
    (2) grants from the federal government as assistance to those areas affected by federal activity authorized in accordance with sections 236 through 240 of Title 20 of the United States Code (commonly known as "PL 874 funds") or an amount equal to the revenue the district was entitled to receive if no application were made for such funds; and
    (3) grants from the federal government to public secondary schools authorized by the United States Vocational Education Act of 1963, as amended (20 U.S.C. 1241–1391).
    D. To determine the amount of the state equalization guarantee distribution the chief shall:
    (1) calculate the number of program units to which each school district is entitled using membership and other required reports for the first forty [40] days of the school year

to every school district in the state except Los Alamos. Los Alamos receives state funds for education under subsection 19(G) expressly because it receives education funds from ERDA under the AECA.[3]

In exhibits presented to the district court, it was estimated the Los Alamos School District would receive more than $2.3 million from the state for the 1974–75 school year under subsection 19(G). Under the general funding formula applicable to all other school districts Los Alamos would have been entitled to approximately $2.8 million during the same period. It was also projected that Los Alamos would receive more than $2.5 million in state funding for 1975–76 under subsection 19(G), which is $475,000 less than it would receive if the general funding formula applied to Los Alamos.

The general funding formula determines the level of state funding by calculating each school district's basic program cost and subtracting 95 percent of the school dis-

trict's local and certain specified federal revenues. Subsection 19(G) provides Los Alamos would receive an increase in state funding to match increased enrollment for the 1974–75 school year and additional increases in subsequent years to match both increases in enrollment and program costs.

The statutory scheme provides that if Los Alamos received no AECA funds for education in a given year then it would come within the general funding formula. Thus Los Alamos is singled out for special treatment merely because it receives AECA funds.

Los Alamos is unquestionably the wealthiest school district in the state. Among school districts of comparable size Los Alamos was ranked first in the state in operational revenue per pupil, in expenditures per pupil, in average teacher salary, in lowest pupil/teacher ratio, in lowest pupil/adult ratio, and in summer school and after school expenditures per pupil. Los Alamos has developed this superior and ex-

and for the first eighty [80] days of the school year;

(2) using the higher number of the result of the calculation in paragraph (1) of this subsection, establish and total program cost of the school district; and

(3) calculate the local and federal revenues as defined in this section; and

(4) deduct the sum of the calculations made in paragraph (3) of this subsection from the program cost established in paragraph (2) of this subsection.

E. The amount of the state equalization guarantee distribution to which a school district is entitled is the balance remaining after the deduction made in paragraph (4) of subsection D of this section.

F. The state equalization guarantee distribution shall be distributed prior to June 30 of each fiscal year. The calculation shall be based on the local and federal revenues specified in this section received from June 1 of the previous fiscal year through May 31 of the fiscal year for which the state equalization guarantee is being computed. In the event that a district has received more state equalization guarantee funds than its entitlement, a refund shall be made by the district to the state general fund.

3. Subsection 19(G) provides:

G. Notwithstanding the methods of calculating the state equalization guarantee distribution in section 77–6–19 NMSA 1953 and Laws

1974, chapter 8, section 22, if a school district receives funds, under section 2391 of Title 42 U.S.C.A., and if the federal government takes into consideration grants authorized by sections 236 through 240 of the United States Code and all other revenues available to the school district in determining the level of federal support for the school district, the amount of the state equalization guarantee distribution for the sixty-third fiscal year shall be the same as the amount of state revenues except for transportation and textbook revenues provided in the sixty-second fiscal year multiplied by the save harmless percentage of subsection F of Laws 1974, chapter 8, section 22, and further multiplied by the ratio of the full-time equivalent ADM for the sixty-third fiscal year to the full-time equivalent ADM for the sixty-second fiscal year. For the sixty-fourth and succeeding fiscal years, the state equalization guarantee distribution for school districts receiving funds under this subsection shall be computed as follows:

$$\frac{\text{fiscal year program cost for the year for which the state equalization guarantee distribution is being computed}}{\text{prior fiscal year program cost}} \times \begin{array}{l}\text{prior fiscal year}\\ \text{state equalization}\\ \text{guarantee distribution}\end{array} = $$

fiscal year state equalization guarantee distribution for the year which the state equalization guarantee distribution is being computed.

pensive educational program through the infusion of millions of dollars in AECA funds.[4]

Since Los Alamos does not contend New Mexico has denied it equal protection by singling it out for special treatment, it is unnecessary to mention the reasons and justifications New Mexico advances for the special treatment. Instead, Los Alamos argues subsection 19(G) is unconstitutional under the supremacy clause because it conflicts with the AECA. The district court entered a judgment for plaintiff declaring subsection 19(G) unconstitutional and ordering defendants to give state educational funds to the Los Alamos School District under the general funding formula applicable to all other school districts. Defendants appeal this judgment. The only issue confronting us is whether Congress in adopting the AECA intended to prohibit New Mexico from funding Los Alamos in a different manner from other school districts solely because it receives educational funds under the AECA.

The supremacy clause provides the " . . Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . ." U.S.Const. art. VI, cl. 2. It establishes as a principle of our federalism that state and local laws are not enforceable if they impinge upon an exclusive federal domain. This impermissible impingement is diversely described as "preemption" and "conflict." The application of those terms means the state or local government has attempted to exercise power which it does not possess because of an express or implied denial of that authority in the Constitution or valid federal laws and regulations promulgated thereunder. See *Northern States Power Co. v. Minnesota,* 8 Cir., 447 F.2d 1143, 1146, *aff'd,* 405 U.S.

1035, 92 S.Ct. 1307, 31 L.Ed.2d 576. *Compare Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248, and *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447, *with Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233.

Plaintiff contends subsection 19(G) conflicts with the AECA. In order to reach our determination of this issue, we review the leading cases of *Hines v. Davidowitz,* 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581, and *Perez v. Campbell, supra.* In *Hines,* the Supreme Court was confronted with an alleged conflict between the Pennsylvania Alien Registration Act of 1939 and the Federal Alien Registration Act of 1940. The Court ultimately held the federal act formed a comprehensive integrated scheme for the regulation of aliens and precluded the enforcement of state alien registration acts such as that adopted by Pennsylvania. In so holding, the Court had to make a determination of "whether, under the circumstances of this particular case, Pennsylvania's law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." 312 U.S. at 67, 61 S.Ct. at 404.

This language is instructive in two respects. First, the Court uses the language "in this particular case" indicating these matters must be decided on a case by case basis. The Court makes this clearer by saying "[t]here is not . . . any rigid formula or rule which can be used as a universal pattern to determine the meaning and purpose of every act of Congress." *Id.* at 67, 61 S.Ct. at 404. Second, it indicates there must be an inquiry into congressional purpose and objective and a comparison with the state law purpose and objective. In making such a comparison in *Hines,* the Court says "where the federal government,

4. Under New Mexico's general funding formula, factors such as the experience and education level of the school district's faculty and the costs and types of educational programs offered by the school district are considered in determining the level of state funding. As a result of the infusion of federal funds, plaintiff school district has developed a highly qualified

faculty and high quality education programs, thus qualifying it for a high level of state funding under the general formula. If plaintiff received state funds under the general formula, it would receive a disproportionately high level of state funds, vis-a-vis other New Mexico school districts, as a direct result of the prior infusion of federal funds.

in the exercise of its superior authority in this field, has enacted a complete scheme of regulation . . . states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law or enforce additional or auxiliary regulations." *Id.* at 66–67, 61 S.Ct. at 404.

At first blush, this is strong, confining language. "[I]nconsistently with the purpose of Congress," however, seems to be somewhat of a qualifying phrase indicating that in some cases where the state and federal purposes are not necessarily inconsistent, certain conflicts between state and federal law will not necessarily render the state law invalid. It should be noted *Hines* offers no absolute test. The Court points out there is no "infallible constitutional test or an exclusive constitutional yardstick." *Id.* at 67, 61 S.Ct. at 404.

*Perez* interpreted *Hines* as establishing a "controlling principle that any state legislation which frustrates the full effectiveness of federal law is rendered invalid by the Supremacy Clause." 402 U.S. at 652, 91 S.Ct. at 1712. In *Perez* the Court held Arizona's Motor Vehicle Safety Responsibility Act conflicted with section 17 of the Bankruptcy Act, 11 U.S.C. § 35, which says a discharge in bankruptcy discharges all but certain specified judgments. The state statute called for the suspension of the license of a driver who was involved in an automobile accident .and who failed to post sufficient security with respect to potential liability. This suspension was to continue until any judgment debt incurred as a result of the accident was paid and proof of financial responsibility was given. The state law expressly said that release from the judgment debt through federal bankruptcy proceedings would not terminate the license suspension. In determining there was a conflict, the Court said:

As early as *Gibbons v. Ogden,* 9 Wheat. 1, [6 L.Ed. 23] (1824), Chief Justice Marshall stated the governing principle—that "acts of the State Legislatures . . . [which] *interfere with,* or are contrary to the laws of Congress, made in pursuance of the constitution," are invalid under the Supremacy Clause. *Id.,* at 211 (emphasis added). Three decades ago Mr. Justice Black, after reviewing the precedents, wrote in a similar vein that, while "[t]his Court, in considering the validity of state laws in the light of treaties or federal laws touching the same subject, ha[d] made use of the following expressions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference[,] . . . [i]n the final analysis," *our function is to determine whether a challenged state statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."* Hines v. Davidowitz, 312 U.S. 52, 67, [61 S.Ct. 399, 404, 85 L.Ed. 581] (1941).

402 U.S. at 649, 91 S.Ct. at 1711 (emphasis added).

In carrying out our function of deciding whether subsection 19(G) is in conflict with the AECA, we must go through a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict. *Perez, supra* at 644, 91 S.Ct. 1704. Turning first to the state statute, since the New Mexico Public School Finance Act has not been authoritatively construed by the New Mexico Supreme Court we will rely heavily on the construction of the district court. The district court described the Public School Finance Act generally as "an equalization formula designed to eliminate adverse educational effects caused by disparities in financial resources available to individual school districts." The general funding formula considers the qualifications and experience of the teachers in each school district in determining the program costs of each school district. In explaining the rationale for treating Los Alamos differently under subsection 19(G), the district court said "[AECA] funds used to retain highly qualified and experienced teachers gives the [Los Alamos] school district a higher teacher training and experience factor, thereby increasing the state's equalization guaran-

tee" to Los Alamos if the Los Alamos School District received state aid under the general funding formula. Thus, instead of taking credit for AECA funds, New Mexico gives Los Alamos school aid under an entirely different formula. It is also clear as the district court pointed out, "[i]f AEC aid was discontinued, Los Alamos would come under the general formula." In summation, the effect of the challenged subsection 19(G) is to give plaintiff approximately $500,000 less in state aid than it would receive in each of the first two fiscal years. Furthermore, in subsequent years under subsection 19(G), state aid to Los Alamos will increase proportionately as its enrollment and program costs rise.

Turning to the federal statute, the construction of the AECA is less clear. There is no express statement in either the statutory language or the legislative history what Congress intended with regard to state aid to school districts receiving AECA funds. See generally the legislative history of the AECA at 1955 U.S. Code Cong. & Admin.News, pp. 2620–45. The broad, general purposes of the AECA are more easily discernible. Congress declared that its policy is to terminate the government ownership and management of the atomic energy communities in an expeditious manner that would not impede the atomic energy program. This is to be accomplished by the AEC and now ERDA assisting in the formation of local self-governing units to which municipal installations, including schools, would be transferred. 42 U.S.C. § 2301. Because the morale of project-connected persons is essential to the common defense and security of the United States, Congress found the federal government could not totally divorce itself from the new civilian communities. Therefore, it authorized funds for assistance in operating the communities. 42 U.S.C. § 2302. The declared purposes of Congress in enacting the AECA are contained in 42 U.S.C. § 2303.

It is the purpose of this chapter to effectuate the policies set forth above by providing for—

(a) the maintenance of conditions which will not impede the recruitment and retention of personnel essential to the atomic energy program;

(b) the obligation of the United States to contribute to the support of municipal functions in a manner commensurate with—

(1) the fiscal problems peculiar to the communities by reason of their construction as national defense installations, and

(2) the municipal and other burdens imposed on the governmental or other entities at the communities by the United States in its operations at or near the communities;

(c) the opportunity for the residents of the communities to assume the obligations and privileges of local self-government; and

(d) the encouragement of the construction of new homes at the communities.

The germane purpose for the instant case is "the maintenance of conditions which will not impede the recruitment and retention of personnel essential to the atomic energy program." See 1955 U.S. Code Cong. & Admin.News at 2635.

We proceed now to the constitutional question whether subsection 19(G) is in conflict with the AECA. The exercise of federal supremacy is not lightly to be presumed. It will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intent to do so. *Merrill Lynch, Pierce, Fenner & Smith v. Ware,* 414 U.S. 117, 94 S.Ct. 383, 38 L.Ed.2d 348; *New York Dept. of Social Services v. Dublino,* 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688; *Goldstein v. California,* 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163. These recent decisions of the Supreme Court suggest that where the conflict is only a potential one or peripheral to the purpose of the federal statute, state legislation will be allowed to stand. As was made clear in our earlier discussion of *Hines* and *Perez,* federal supremacy issues must be decided on a case by case basis and certain conflicts between state and federal law will not necessarily render the state law invalid.

In deciding the constitutional question, if the plain and inevitable effect of the state statute is to impair the operation of the federal statute, the state statute may not stand. *Perez, supra* 402 U.S. at 652, 91 S.Ct. 1704. Plaintiff argues and we agree that the primary reason AECA funds are given to plaintiff is to provide Los Alamos with a high quality school system "which will not impede the recruitment and retention of personnel essential to the atomic energy program." The effect of the challenged subsection is to provide plaintiff with less school aid solely because it receives AECA funds.

We are confronted with the problem whether the failure of the state to give funds to plaintiff under the same formula used for other districts stands as an obstacle to Congress' attempt not to impede the recruitment and retention of necessary personnel. Had Congress focused on the problem presented herein, the supremacy issue might well be different. However, the parties have not cited any indication that Congress addressed or resolved this question. *Compare Perez, supra* at 655, 91 S.Ct. 1704. Thus, this court must dispose of the matter without the assistance of legislative consideration.

We conclude subsection 19(G) does not "frustrate the full effectiveness" of the AECA. In reaching our conclusion we are guided by several considerations: We are reluctant to strike down state legislation in the face of complete congressional silence; plaintiff made no attempt to show that New Mexico's level of funding has impeded or would impede the recruitment or retention of necessary personnel; subsection 19(G) provides for increases in state aid as plaintiff's enrollment and program costs increase; the New Mexico statutory scheme does not impair Congress' policy of completely removing itself from the managing and funding of atomic energy communities since plaintiff would be eligible for increased state aid if AECA funds were terminated; and in *San Antonio School Dist. v. Rodriguez,* 411 U.S. 1, 42, 93 S.Ct. 1278, 36 L.Ed.2d 16, the Supreme Court emphasized that state school finance laws "should be entitled to respect." Since we have been directed to no congressional manifestation of intent to limit the manner in which states give educational aid to atomic energy communities, we conclude subsection 19(G) does not offend the supremacy clause.

In striking down subsection 19(G) the district court relied primarily on five so-called Impact Aid Act cases. *Carlsbad Union School Dist. v. Rafferty,* S.D.Cal., 300 F.Supp. 434, *aff'd,* 9 Cir., 429 F.2d 337; *Triplett v. Tiemann,* D.Neb., 302 F.Supp. 1244; *Hergenreter v. Hayden,* D.Kan., 295 F.Supp. 251; *Douglas Independent School Dist. v. Jorgenson,* D.S.D., 293 F.Supp. 849; *Shepheard v. Godwin,* E.D.Va., 280 F.Supp. 869. These five cases held that state laws which provide for the deduction of certain percentages of federal impact funds, 20 U.S.C. § 236 *et seq.,* from the amount of state aid which would otherwise have been allocated by the state to impacted school districts were violative of the supremacy clause. These Impact Aid Act cases are readily distinguished from the instant case. In those cases the Congress had expressly manifested its intent in H.R.Rep.No. 1814, 88th Cong. (1966):

Fifteen States offset the amount of [Impact Aid Act] funds received by their school districts by reducing part of their State aid to those districts. This is in direct contravention to congressional intent.

1966 U.S. Code Cong. & Admin.News, p. 3878. All five cases relied on this expression of congressional intent to hold the state laws violated the supremacy clause. We are here guided by no similar manifestation of congressional intent. In the absence of any evidence that Congress intended to limit the manner in which states fund school districts in atomic energy communities, and the further lack of evidence that the avowed intent of Congress to create far *superior* schools has been frustrated or will be frustrated, we hold that subsection 19(G) does not unconstitutionally conflict with the AECA. To hold otherwise, that federal aid was intended as a supplement to state

funds, begs the question. In fact, when the federal plan to finance Los Alamos was originated there was nothing to supplement.

REVERSED.

WILLIAM E. DOYLE, Circuit Judge, dissenting.

I respectfully dissent.

The basis for my disagreement arises from the fact that the effect of the state statute is to frustrate the effort of Congress to create a superior school system in Los Alamos. The majority opinion states that there is not an expression in either the federal statutory language or the legislative history as to the specific intent of Congress with respect to state aid to school districts receiving AECA funds. The opinion does concede that there are broad general purposes in the AECA which are apparent. The majority does not apply these general legislative purposes to schools. Congress has, however, expressed an intent to maintain a high level of services in order to attract and retain personnel of high caliber who can contribute to the common defense and security of the United States. Such a purpose is expressed at 42 U.S.C. Section 2302, which provides:

> The Congress of the United States makes the following findings concerning the communities owned by the Atomic Energy Commission:
>
> (a) The continued morale of project-connected persons is essential to the common defense and security of the United States.

Senate Report No. 1140, at 1955 U.S. Code Cong. & Admin.News, pp. 2620–45, notes that there were at that time high quality schools in the AEC towns and it requires the AEC to keep them at their high level by continuing aid for the purpose of attracting high caliber personnel. The report generally recognizes the necessity for maintaining high quality schools.

The clear *effect* of withdrawal of state support to these schools will be a very substantial diminution in funding. It will require the United States to reexamine the sufficiency of its contribution. Undoubtedly it will have to supplement to the extent that the state has withdrawn funds. In my judgment this is a direct frustration of the Congressional intent. The majority opinion cannot fail to recognize that the controlling principle to be applied is that where state legislation frustrates the full effectiveness of the federal law, it is invalid under the Supremacy Clause of the United States Constitution. *See Perez v. Campbell,* 402 U.S. 637, 652, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971).

The reasoning of the majority is that since the Congressional Act did not specifically anticipate the present turn of events, New Mexico is free to take the action which it took. The fault in the reasoning is that the majority has not given due weight to the general findings of Congress that the morale of the persons connected with the project was to be maintained in the interest of the common defense and security of the United States. Furthermore, the maintenance of high quality schools was considered essential to high morale. Accordingly, the presence of the federal interest herein cannot be denied, and this factor weighs heavily in determining the validity or invalidity of the state statute. *See Hines v. Davidowitz,* 312 U.S. 52, 67–8, 61 S.Ct. 399, 85 L.Ed. 581 (1941). The Supreme Court in *Hines* recognized that the federal interest in legislation having to do with the registration of aliens derived from the government's interest in international relations. In that respect it said that "[a]ny concurrent state power that may exist is restricted to the narrowest of limits". *Id.* at 68, 61 S.Ct. at 404. The Pennsylvania Alien Registration Act was held to be in conflict with federal enactments.

It is true that New Mexico has not attempted to regulate directly in this area of federal interest. However, by going in through the back door, so to speak, in an effort to save state funds and to increase the burden of the federal government, it has created a greater interference than could have been possible through direct means. When, as here, the federal govern-

ment has created a school system, has presented it to the state of New Mexico, has provided funding for this school system in the interest of attracting the best possible personnel and then the state reduces its annual support of this school system from approximately 2.8 million dollars to 2.3 million dollars, it is acting contrary to the federal government's effort to maintain the high standards which it has established. This is contrary to the intent of the legislation which granted the funds. This interference with federal activity and this frustration of federal purpose, if it passes judicial scrutiny, will be extended in future years and if the majority's analysis is valid, there is nothing to prevent New Mexico from withdrawing all aid from this school system. Furthermore, it could spread to other areas. The final result could be that the federal government would withdraw all financial aid from these communities and schools or that it could, of course, adopt other more specific legislation. This, however, should not be required, for this would lead to more litigation, delay, uncertainty, and perhaps further competitive manipulation.

It is for these reasons that I believe that the majority decision should not stand.