William L. SHEPHEARD, Sr., et al., Plaintiffs,

v.

Mills E. GODWIN, Jr., et al., Defendants.

Civ. A. No. 6249.

United States District Court
E. D. Virginia,
at Norfolk.

Argued Dec. 19, 1967.

Decided Feb. 6, 1968.

Opinion on Motions Argued
Feb. 15, 1968.

Decided Feb. 16, 1968.

---

Henry E. Howell, Jr., Howell, Anninos & Daugherty, Norfolk, Va., for plaintiffs.

Clive L. DuVal, II, William R. Durland, Springfield, Va., E. A. Prichard, Fairfax, Va., and Harriett F. Bradley for plaintiffs-intervenors.

Robert Y. Button, Atty. Gen. of Virginia, Robert D. McIlwaine, III, Richard N. Harris, Asst. Attys. Gen., and Henry T. Wickham, Special Counsel, for defendants.

Before BRYAN and BUTZNER, Circuit Judges, and HOFFMAN, District Judge.

## OPINION

ALBERT V. BRYAN, Circuit Judge:

"Impacted" school areas are those whose school populations have been substantially enlarged by the attendance of Federal employees' children, but at the same time are losing school tax revenues because of the United States government's immunity from land taxes, both factors arising from increased Federal activities in the area. These conditions prompted Congress to provide financial aid for operation of the local educational facilities, P.L. 874 [1].

1. 20 U.S.C. § 236 et seq. (Supp.1967). Section 237 of the Act, which establishes the basic structure of the aid program, reads as follows:

"(a) Where the Commissioner [of Education], after consultation with any local educational agency and with the appropriate State educational agency, determines for any fiscal year ending prior to July 1, 1968—

"(1) that the United States owns Federal property in the school district of such local educational agency, * * *; and

"(2) that such acquisition has placed a substantial and continuing financial burden on such agency; and

"(3) that such agency is not being substantially compensated for the loss in revenue resulting from such acquisition [of land by the United States] * * * then the local educational agency shall be entitled to receive for such fiscal year such amount as, in the judgment of the Commissioner, is equal to the continuing Federal responsibility for the additional financial burden with respect to current expenditures placed on such agency by such acquisition of property, to the extent such agency is not compensated for such burden by other Federal payments with respect to the property so acquired. Such amount shall not exceed the amount which, in the judgment of the Commissioner, such agency would have

derived in such year, and would have had available for current expenditures, from the property acquired by the United States * * *."

For determination of the Federal contribution the "Federal" children are, as pertinent here, divided by § 238(a) and (b) into two classifications. The first embraces, by 238(a), those residing on Federal property with a parent employed on Federal property or on active duty in the uniformed services; and the second classification, by 238(b), consists of those children who either resided on Federal property or resided with a parent employed on Federal property.

The amount of the entitlement of each locality is computed in the manner prescribed by § 238(c) as follows:

"(c) (1) The amount to which a local educational agency is entitled under this section for any fiscal year shall be an amount equal to (A) the local contribution rate (determined under subsection (d) of this section) multiplied by (B) the sum of the number of children determined under subsection (a) and one-half of the number determined under subsection (b) of this section.

* * * * *

"(d) The local contribution rate for a local educational agency * * * for any fiscal year shall be computed by the Commissioner of Education, after consulta-

In applying a State formula for State assistance to local school districts,[2] Virginia has deducted from the share otherwise allocable to the district a sum equal to a substantial percentage of any Federal "impact" funds receivable by the district.

Residents, real estate owners and taxpayers of the City of Norfolk, later joined by those of the County of Fairfax, Virginia, in behalf of themselves and others similarly situated, here attack this deduction and an alternative provision as violative of the purpose and intent of the act of Congress and as transgressing the Fourteenth Amendment. We uphold their contention.

Defendants are the State officials charged with the responsibility and duty of distributing the public moneys appropriated for schools by the legislature, the General Assembly of Virginia. There is no claim that these officers failed to follow the directions of the State law. The question here is the validity of that legislation.

Concededly, the amounts capturable in taxes on lands and buildings in Norfolk and Fairfax, respectively, if the property occupied by the Government were generally assessable or leviable for school support, would far exceed the Federal contribution in each place. Likewise it must be acknowledged that the influx of employees accompanying the Government's operations has swelled the school populations enormously in this city and county, necessitating enlarged outlays both in operating and capital expenses.

As applied by the United States Commissioner of Education, the act of Congress provided for payments for the 1965–66 school year for operating costs of $269.36 for each child in the Norfolk school system whose parent resided and worked upon Federal property, and the sum of $134.68 for each child whose parent worked on the property but did not live there. Corresponding figures for Fairfax were $311.19 and $155.59, respectively. From 1951 to 1967, inclusive, the Federal assists under P.L. 874 to Norfolk amounted to $29,107,305.15, and to Fairfax $49,636,235.31.

Commencing at the 1948–49 school term Virginia established the Minimum Education Program. As the title indicates, it represents a program which was determined necessary to provide each child in the State a minimum education. To take care of the program's cost a Basic State School Aid Fund was created. It fixed a minimum program cost for every political subdivision of the State, i. e. counties and cities.

The minimum program cost in each district was declared to be the aggregate of two items. The first was the amount of the instructional salaries when reckoned by a stated formula for each teacher position. The second item was the product of the average daily attendance (ADA) multiplied by $100 in 1966–68 ($80 in 1964–66) per pupil. The subdivision must expend at least this total each year for its schools. See Va. Acts of Assembly, ch. 719, Item 459(c) (5) (1966).

A contribution to be made by the State to the cost in every political subdivision is spelled out also. It is comprised of (1) a basic State share and (2) a supplementary State share. The *basic* State share amounts to 60% of the instructional salaries. The *supplementary* State share is reached by subtracting from the minimum program cost (the gross in-

tion with the State educational agency, in the following manner:

"(1) he shall place each school district within the State into a group of generally comparable school districts; and

"(2) he shall then divide (A) the aggregate current expenditures, during the second fiscal year preceding the fiscal year for which he is making the computation, which all of the local educational agencies within any such group of comparable school districts made from revenues derived from local sources, by (B) the aggregate number of children in average daily attendance to whom such agencies provided free public education during such second preceding fiscal year.

"The local contribution rate shall be an amount equal to the quotient obtained under clause (2) of this subsection."

2. See Va. Acts of Assembly, ch. 719, Item 459, p. 1496 (1966).

structional salaries plus the total of the $100 per pupil ADA) the following items: (1) the basic State share; (2) an amount equivalent to a uniform tax levy of 60 cents per $100 of true values of local taxable real estate and public service corporation property in the subdivision; and (3) 50% (in 1966–68) of the impact funds receivable by the subdivision from the Federal government for operating costs. A maximum is fixed for the supplementary State share. Administration of this allocation of State money is put in the hands of the State board of Education.

Until the 1956–57 school session the State deducted nothing from its own assistance by reason of the impact moneys. In certain later years it deducted all of it. In the 1964–66 biennial it reduced the deductions to $\frac{2}{3}$, and for the 1966–68 to $\frac{1}{2}$, of the Federal funds.

The theory of the deduction in toto was that the Federal moneys were substituting for the taxes lost to the district by reason of the immunity of the Government property, and hence should be charged to the locality, just as the taxes would have been, in fixing the State supplementary aid. The $\frac{1}{3}$ and $\frac{1}{2}$ later allowed the affected community was permitted on the ground that the equation of impact money with taxes was not exact and entirely sound, since many of the parents would be living on Government property and would pay no local taxes. A further justification was that the community was entitled to reimbursement for the administrative expense of ascertaining and collecting the Federal allocations. No figures to prove the approximate correctness of the asserted equation were adduced.

The grievance of the plaintiffs is obvious: any deduction whatsoever of the Federal supplement in apportioning State aid, pro tanto burdens them as taxpayers, for they and the other property owners in Norfolk and Fairfax have to make up the unindemnified portion of the impact costs. They contend that any deduction is prohibited by the purpose and plan of the Federal act.

The rejoinder of the defendant officials is, first, that the impact pupils are counted by the State in computing the minimum program cost in the district, and in accounting with the district for the State's supplementary aid it is not inequitable to insist upon a deduction of a commensurate amount of the impact moneys. At first appealing, this argument ignores the fact that the Federal children are to a large extent paying their own way so far as the *State* is concerned. Quite soundly, the Congressional Committee on Education and Labor in recommending passage of P.L. 874, observed that the influx of Federal employees, and the withdrawal of real estate from taxes, did not diminish the tax sources of the State or otherwise burden the State. Its revenues are obtained from taxation to which the additional Federal employees are subject along with the other residents of the area. The Committee, in Report No. 2287, dated June 20, 1950, said:

"The reason for not providing in the bill for any payment paralleling the State share in the cost of educating children who reside on or whose parents are employed on Federal property is that the tax-exempt status of the property in question does not normally operate to reduce to any appreciable extent State revenues or otherwise to render the State less able to make its normal contribution with respect to such children. Through sales, gasoline, income, and other forms of taxation, State governments are realizing or could realize substantially as much revenue from the parents of these children as they realize in the case of anyone else in the State. * * * Besides, the State, because of the size and variety of its sources of taxation and of its tax methods, can realize benefits in indirect revenues from the carrying on of Federal activities within its borders which will offset what appears to be an immediate loss in its inability to tax directly the activities in question."

Id. at 13.

Secondly, say the defendant State officials, the calculation of the district's share—the equivalent of 60-cent tax—in computing the supplementary aid, omits consideration of the value of the Federal occupied property and hence, in place of this omitted deduction, it is only fair to subtract the amount of the impact funds which are intended to substitute for the Federal-occupied land taxes. But this argument is based on misconception of the Federal aid as *substituting for* rather than *supplementing* local revenues. As will appear when we later scrutinize the act, this is a mistaken understanding of the Federal act.

Our conclusion is that the State formula wrenches from the impacted localities the very benefaction the act was intended to bestow. The State plan must fall as violative of the supremacy clause of the Constitution. Our decision rests entirely on the terms, pattern and policy of the act.

The act makes these propositions clear: (1) the Federal funds are exclusively for supplementation of the local sources of revenues for school purposes; and (2) the act was not intended to lessen the efforts of the State. Those postulates are manifested in the statute by these provisions, especially: that the Federal contribution be paid directly to the local school agency on reports of the local agency, and that the contribution be computed by reference to the expenditures "made from revenues derived from local sources" in comparable school districts.

But the State formula at once sets these precepts at naught. It uses the impact funds to account in part for fulfillment of the State's pledge of supplementary aid to the community; and the State moneys thus saved are available for State retention or such use as Virginia determines. Without the inclusion of the Federal sums the State's annual payments towards supplementary aid would be increased, it is estimated, by more than $10,000,000.

This commandeering of credit for the Federal moneys severely injures both the community and the pupil. First and foremost, it does not relieve the local taxpayers to the extent Congress contemplated. Next, without the exclusive application of the funds to the areas where the need arose and remains, the result may be to lower the standard of education provided in an impacted district. Instead of maintaining the previous standards for the additional pupils, the impact money when thinned by the State would obviously be inadequate to continue that level for the increased school attendance, a result certainly thwarting the aim of the Federal law.

The construction and the implications we put upon the act find confirmation in its legislative history. In Report No. 2287, supra, of the Committee on Education and Labor, dated June 20, 1950, 81st Congress, 2d Session, the legislation which became P.L. 874 is explained in detail. The exposition underscores the Congressional mandate that the impact payments are for local use and are not to be applied to compensate the State in any respect. Thus, at p. 13, it is stated:

"The effect of the payments provided for in this section is to compensate the local educational agency for loss in its *local* revenues. *There is no compensation for any loss in State revenues. * * *"* (Accent added.)

In response the defendants urge this intent was impliedly nullified by the amendment of the act in 1965. 79 Stat. 27. The argument is that the amendment consisted of the reenactment of P.L. 874 without change save to designate it as Title I, and to attach legislation, to be known as Title II, relating to another subject of Federal aid. In Title II the following proviso was included:

"No payments shall be made under this subchapter for any fiscal year to a State which has taken into consideration payments under this subchapter in determining the eligibility of any local educational agency in that State for State aid, or the amount of that aid * * *." 20 U.S.C. § 241g(c) (1) (Supp.1967)

No such clause was put in the reenactment of P.L. 874, and therefore, the defendants conclude that Congress did not intend to foreclose a State from taking into consideration Federal impact payments to a locality in determining State aid to a local school agency.

However, this argument is refuted, first, by reference to the apparent reason the proviso was included in Title II. There the Federal moneys are paid directly to the State, and consequently there was need for a direct admonition against its use by the State. Under Title I, as we have already noted, the moneys are paid to the locality and not to the State, and there was no apparent reason to include any restriction upon the State. Moreover, this omission from P.L. 874 originally, or as reenacted, would seem to imply that no touch, direct or indirect, of the money by the State was even remotely permissible.

Since its explanation in 1950 when P.L. 874 was passed that no compensation was intended for the State, Congress has reiterated this intention. In this repetition it definitely disapproves the accounting use Virginia's formula makes of the impact moneys. The House of Representatives Committee Report No. 1814, dated August 5, 1966, in proposing an amendment to P.L. 874 stated:

"Fifteen States offset the amount of Public Law 874 funds received by their school districts by reducing part of their State aid to those districts. *This is in direct contravention to congressional intent.* Impact aid funds are intended to compensate districts for loss of tax revenues due to Federal connection, not to substitute for State funds the districts would otherwise receive.

"The committee understands that it is administratively unfeasible, if not impossible, to determine adjusted allotments to those States already following this practice. However, to prevent its occurrence in the future, we propose an amendment which would reduce Public Law 874 eligibility in proportion to any State reduction in aggregate per pupil expenditures." (Accent added.)

The amendment, 20 U.S.C. § 240(d) (Supp.1967), reads as follows:

"(d) The amount which a local educational agency in any State is otherwise entitled to receive under section 237, 238, or 239 of this title for any fiscal year shall be reduced in the same proportion (if any) that the State has reduced for that year its aggregate expenditure (from non-federal sources) per pupil for current expenditure purposes for free public education (as determined pursuant to regulations of the Commissioner) below the level of such expenditures per pupil in the second preceding fiscal year. The Commissioner may waive or reduce this reduction whenever in his judgment exceptional circumstances exist which would make its application inequitable and would defeat the purpose of this subchapter."

■ The committee report and the amendment are cited merely as evidence of Congressional intendment. The amendment provides only an administrative remedy of the Government and does not deprive the plaintiffs of standing to prevent future State infringement of their Constitutional right to the benefits of the aid purposed by Congress. Necessarily, then, the upshot is that the defendants must be enjoined from hereafter in any way denying to the impacted area the exclusive use and enjoyment of the impact funds.

Apparently foreseeing the possibility of such restraint, the Appropriation Act of 1966 of Virginia, ch. 719, Item 459(c) (8) included the following provision:

"8. In the event the availability of Federal funds for local operating expenses is conditioned upon their exclusion from a State apportionment formula, the State Board of Education shall exclude both such Federal funds and the average daily attendance for the pupils involved from the application of this item."

■ The validity of this provision is attacked by the plaintiffs as illegal and

violative of the equal protection clause of the Constitution. Enforcement of it would mean that children of members of the armed services, or other employees of the United States, living in an impacted area on or off Federal property would not be counted, and no contribution by the State would be made for them, in determining the amount to be expended by the State for schools in the area of their residence. This is a discrimination without justification, and we must strike it down as unconstitutional.

■ The Norfolk plaintiffs have also prayed for an order directing the defendants to restore to the Norfolk schools the amounts of State aid which in prior years have been withheld by the State on account of the Federal impact funds. To accomplish this restitution would require an appropriation by the legislature of Virginia. A decree to that effect would be an order to the State to take affirmative political action, and would convert this into a suit against the Commonwealth of Virginia, prohibited by the Eleventh Amendment. E. g., Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945); Hagood v. Southern, 117 U.S. 52, 6 S.Ct. 608, 29 L.Ed. 805 (1886).

■ The structure of the present court has been a question in this suit. Doubtlessly, if the only issue were the asserted conflict between the State appropriation statute and the Federal act, a three-judge court may not be required. See Kesler v. Department of Public Safety, 369 U.S. 153, 82 S.Ct. 807, 7 L.Ed.2d 641 (1962). However, in addition to the conflict of statutes, substantial Constitutional points were made which remove the case from the jurisdiction of a single judge. 28 U.S.C. §§ 2281, 2284, Florida Lime & Avocado Growers v. Jacobsen, 362 U.S. 73, 84–85, 80 S.Ct. 568, 4 L.Ed. 2d 568 (1960). These issues arise in connection with the stipulation in the appropriation act which directed the omission of the children of Federal employees from the provision of the State for school help to the localities and arise, too, in the prayers for recovery of past deductions by the State from Norfolk's school aid. Mann v. Davis, 213 F.Supp. 577, 579 (E.D.Va.1962), aff'd 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964) (3-Judge Court).

■ The motion to drop the Governor of Virginia as a defendant should be granted. He is not a necessary party and his presence is not needed in the effectuation of the relief the court now decrees.

An order implementing this opinion is filed herewith.

## ORDER ON OPINION

Upon consideration of the pleadings, the stipulations of counsel, the exhibits and the entire record in this action, as well as the arguments thereon of counsel orally and on brief, the court for the reasons stated in its opinion filed herewith finds, adjudges and orders as follows:

1. That the Governor of Virginia be, and he is hereby, dropped as a party defendant herein;

2. That the motions of the defendants to dismiss this action be, and they are hereby, denied;

3. That the objection of the plaintiffs and intervenors to the convening of a three-judge court for the hearing and decision of this action pursuant to the provisions of 28 U.S.C. §§ 2281, 2284 be, and it is hereby, overruled;

4. That the defendants and their successors in office be, and each of them is hereby, restrained and enjoined from hereafter in any manner enforcing or effectuating the 1966 Acts of the General Assembly of Virginia, and particularly chapter 719, Item 459, p. 1496, insofar as this legislation directs or requires a deduction to be made in the computation of State aid to local public schools of Virginia based on, or in consideration of, any part of the moneys payable to, or for the benefit of, such local schools by the United States of America under and by virtue of Public Law 874, 81 Cong., 2d Session, approved September 30, 1950, 64 Stat. 1100, 20 U.S.C. § 236 et seq., as amended, (Supp. II 1965–1966), and the

 

defendants and their successors in office be, and each of them is hereby, restrained and enjoined from in any manner enforcing or effectuating so much of the provisions of the said 1966 Acts of the General Assembly of Virginia as are contained in Item 459c.8., chapter 719, p. 1498;

5. That the prayer of the plaintiffs for refund and restoration by the defendants of the amounts of the Federal impact funds heretofore deducted in the computation of the amounts payable to or on behalf of the public schools of the City of Norfolk as State supplementary aid, be, and it is hereby, dismissed for lack of jurisdiction thereof in this court; and

6. That this action be, and it is hereby, continued and jurisdiction thereof retained, with leave to any party to apply on notice for such further orders as may be deemed necessary or proper.

## OPINION ON MOTIONS

The defendant State school authorities move us to defer until July 1, 1968 the effectiveness of the injunction issued in this action on February 6, 1968, and to stay the injunction pending their appeal to the Supreme Court against it.

■ Principally, they point to the difficulty of redistributing the unexpended appropriations of funds for public education made by the General Assembly of Virginia at its 1966 session for the fiscal biennium extending from July 1, 1966 to June 30, 1968. To recompute and redistribute these sums to each county and city in the State upon readjustment of them following omission of credit of the Federal moneys payable to the impacted areas, we are told, would necessitate the withdrawal of appropriations allocated since 1966 for schools throughout the State and for other agencies of the State, all of which have been accepted and acted upon since July 1, 1966. For instance, the local schools and State agencies have budgeted and incurred obligations on the strength of the 1966 allocations.

Upon further deliberation we recognize the complexities in an immediate compliance with our decision. We note, too, that the defendants acted in good faith, though mistaken, in their deduction of the Federal impact funds in fixing the State's supplementary aid in the impacted areas. In equity the State authorities should not, through an error in the interpretation of the Federal law, be put in the confusing and disrupting, if not inextricable, position of reallocating State appropriations at this late date in the fiscal year. Postponement of compliance would accord with the Congressional report of 1966, quoted in the opinion heretofore filed in this case. The report noted the administrative difficulties of correcting present misallocations, but moved to prevent reoccurrence in the future.

Therefore, we will amend our injunctive order to postpone its effectiveness until July 1, 1968, but it shall be then and thereafter in force against any provisions in enactments for subsequent periods which would violate the conclusions expressed in our first opinion. As this amendment will in effect award the stay prayed in the second motion to allow an appeal, we have no occasion to pass upon that motion.