MIDDLETOWN SCHOOL COMMITTEE
et al.

v.

BOARD OF REGENTS FOR
EDUCATION OF the STATE
OF RHODE ISLAND et al.

Civ. A. No. 77–0226.

United States District Court,
D. Rhode Island.

Oct. 14, 1977.

Joseph B. Going, Newport, R.I., for plaintiffs.

J. Peter Doherty, Sp. Asst. Atty. Gen., Providence, R.I., Howard R. Haronian, Warwick, R.I., for defendants.

Lincoln C. Almond, U. S. Atty., Providence, R.I. and Robert J. Faux, U. S. Dept. of HEW, Washington, D.C., for amicus curiae.

OPINION

PETTINE, Chief Judge.

Pursuant to Public Law 81–874,[1] the federal government makes educational aid funds available to certain school districts (sometimes called "impacted districts") burdened with the responsibility of providing education to children who attend their schools because of nearby federal activity.

---

1. Public Law 81–874 (1950), as amended, is codified at 20 U.S.C. § 236 et seq. (1977).

The Middletown School Committee and five resident taxpayers (hereinafter "Middletown"), seeking injunctive and declaratory relief, challenge under the Supremacy Clause the manner in which Rhode Island considers these payments in computing the state aid which Middletown receives. Jurisdiction is properly grounded on 28 U.S.C. § 1331. Plaintiffs' standing to prosecute this action is not controverted. The Court heard this matter in a merged hearing on June 9–10, 1977, and has been ably assisted by counsel and by the United States, which appeared as amicus curiae at the Court's suggestion and request.

Like most states, Rhode Island assists local school districts by providing them with state funds. Disregarding certain complexities in the Rhode Island aid plan which have no effect on the issues here, it is fair to say that Rhode Island reimburses each local district, without ceiling, for a percentage of all the school expenditures imposed by district taxpayers on themselves—thereby excluding PL 81–874 aid completely from the calculation.[2] The percentage, or share ratio, reimbursed by the state differs for each local district, and is determined by a percentage equalization formula through which Rhode Island seeks to equalize the ability of poor and wealthy districts to provide quality education.[3] The legislature has set the share ratio of the average district (in terms of assessed valuation of property per pupil) at 35%. The share ratio for any particular district is determined by a formula which, in essential respects, is as follows:[4]

$$\text{Share ratio} = 1 - \left[ 0.65 \times \frac{\text{assessed valuation per pupil in the local district}}{\text{assessed valuation per pupil in the state}} \right]$$

The formula dictates that a town of average wealth will be reimbursed for 35% of its locally raised school expenditures. Poorer districts will have a share ratio greater than 35%, and will be reimbursed for a greater proportion of locally raised expenditures than average districts. Wealthier districts will have a smaller share ratio, and will be reimbursed for somewhat less than 35% of locally raised school expenditures.[5] Rhode Island's formula thus distributes aid in inverse proportion to the ability of a district to raise revenues. Given two districts which impose on themselves the same property tax rate, the poorer district will be reimbursed a greater percentage of its locally raised expenditures than the wealthier district. In addition, because state aid is determined by applying the share ratio to the locally raised school expenditures without a ceiling, the formula distributes aid in direct proportion to the effort of a district to maintain quality schools through increased taxation rates. Thus, given two

2. *See* Rhode Island General Laws (R.I.G.L.) § 16–7–15 *et seq.*, and n. 7 *infra; see generally* Tr. at 83–119.

3. The concept of taxing power equalization is discussed at length in J. Coons, W. Clure and S. Sugarman, Private Wealth and Public Education (1970). *See also* Comment, State Constitutional Restrictions on School Finance Reform, 90 Harv.L.Rev. 1528–31 and authorities cited therein. Rhode Island's formula has been found to do a better job of equalizing the ability of districts to provide quality education than the formulas of 47 other states. Tr. at 85. A different equalization formula, which did not provide for reimbursement of local expenditures without limitation, was struck down as in conflict with the purposes of Pub.L. 81–874 in *Hergenreter v. Hayden*, 295 F.Supp. 251 (D.Kan.1968).

4. The formula is in reality a good deal more complex than is stated here, but the parties are agreed that the simplification as described in the text is sufficient to display the operation of Pub.L. 81–874 funds on the state aid plan.

5. The legislature has provided that the minimum share ratio, or reimbursement level, for any community is 30%.

communities with approximately equal wealth (i. e., equal assessed valuation per pupil) the community which chooses to tax itself more to improve its schools will earn greater state aid.[6] A local district can therefore always increase its state aid by increasing its own effort. For Middletown, which has a sizeable amount of tax-exempt federal property and a significant number of pupils who are children of adults working on federal property, the Rhode Island formula has the effect of relatively increasing the state aid received because there is less assessed valuation per pupil than there would be if the federal property was included in the district wealth per pupil calculation.

Nevertheless, because the formula for determining state aid set forth in R.I.G.L. § 16–7–20 requires the share ratio to be applied to the school expenditures of each local district,[7] it is apparent that Middletown's aid would be increased if Pub.L. 81–874 funds were included in the state's definition of expenditures. Middletown claims that section 5(d)(2) of Pub.L. 81–874, 20 U.S.C. § 240(d)(1) (1977),[8] requires Rhode Island to include Pub.L. 81–874 funds in its calculation, and that R.I.G.L. § 16–7–20 is invalid under the Supremacy Clause for its failure so to provide. The Court agrees with amicus United States that Rhode Island's aid scheme is fully consonant with the letter and spirit of Pub.L. 81–874, as amended, and that the Rhode Island aid scheme is therefore not invalid under the Supremacy Clause.

█ The parties are in agreement that Congress intended Pub.L. 81–874 funds to supplement, not to substitute for, state aid to local districts. See, e. g., Shepheard v. Godwin, 280 F.Supp. 869, 875 (E.D.Va.1968) (three-judge court); Douglas Independent School District No. 3 v. Jorgenson, 293 F.Supp. 849, 852 (D.S.D.1968); Hergenreter v. Hayden, 295 F.Supp. 251 (D.Kan.1968); Carlsbad Union School District of San Diego County v. Rafferty, 300 F.Supp. 434

---

**6.** See Tr. at 107–119 and Def. Ex. 9.

**7.** R.I.G.L. 16–7–20 provides in relevant part: For each community the state's share shall be that percentage of one hundred per cent (100%) resulting from subtracting the yield of the standard local tax rate applied to adjusted equalized weighted assessed valuation divided by the reference year cost of the basic program; provided, however, that in no case shall the state's share be less than thirty per cent (30%) for the fiscal year 1964–1965 and year thereafter. This percentage shall be applied to one hundred and five per cent (105%) of (A) the cost of the basic program and (B) all expenditures approved by the state board of education in excess of the basic program; provided, however, that expenditures from federal moneys in lieu of taxes shall not be counted  .   .   .

**8.** 20 U.S.C. § 240(d)(1) (1977) provides:
Except as provided in paragraph (2), no payments may be made under this subchapter for any fiscal year to any local educational agency in any State (A) if that State has taken into consideration payments under this subchapter in determining—
(i) the eligibility of any local educational agency in that State for State aid for free public education of children; or
(ii) the amount of such aid with respect to any such agency; during that fiscal year or the preceding fiscal year, or (B) if such State makes such aid available to local educational agencies in such a manner as to result in less State aid to any local educational agency which is eligible for payments under this subchapter than such agency would receive if such agency were not so eligible.

This section was first enacted in 1968, and was codified at 20 U.S.C. § 240(d)(2) until this year. See Pub.L. 90–576, § 305(a), 82 Stat. 1097. By amendments to Pub.L. 81–874 enacted in 1974 and 1976, Congress has established a new administrative mechanism to determine whether state aid equalization formulas which the Commissioner of the Office of Education determines violate the prohibitions of 20 U.S.C. § 240(d)(1) (1977) should nevertheless be permitted without penalty. See 20 U.S.C. § 240(d)(2) (1977). This lawsuit, however, concerns a period for which this administrative procedure cannot be utilized. See 20 U.S.C. § 240(d)(2)(C) (forbidding administrative enforcement for any period prior to July 1, 1977). It is of some importance, nevertheless, that the Office of Education, which will be responsible for handling any disputes over Rhode Island's formula in future years, has taken the position that Rhode Island's formula does not contravene the prohibitions of 20 U.S.C. § 240(d)(1) (1977), and therefore that there is no need to inquire whether Rhode Island's equalization formula would be entitled to an exception under § 240(d)(2). See Brief of the United States as Amicus Curiae at 21.

(S.D.Cal.1969), *aff'd* 429 F.2d 337 (9th Cir. 1970). Until 1968, the remedy for districts in states which had contravened the purposes of Pub.L. 81–874 by reducing aid to local districts in response to the receipt of federal funds was an injunction to stop the states from doing so. *See, e. g., Shepheard v. Godwin,* 280 F.Supp. at 869; *Carlsbad Union School District v. Rafferty,* 429 F.2d at 339. In 1968, to implement the *Shepheard* decision, which was the first case to decide that a state aid formula reducing state aid to an impacted district was invalid under the Supremacy Clause, Congress amended Pub.L. 81–874 to delineate more clearly the circumstances in which a state aid formula would run afoul of the purposes of Pub.L. 81–874,[9] and to provide a more effective enforcement remedy. The amendment forbids federal impacted aid payments to any local district in any state which has:

> taken into consideration payments under this subchapter in determining the eligibility of any local educational agency in that State for State aid . . ., or the amount of such aid, . . . or if such State makes such aid available to local educational agencies in such a manner as to result in less State aid to any local educational agency which is eligible for payments under this subchapter than such [local educational] agency would receive if [it] were not so eligible.

> 20 U.S.C. § 240(d)(1) (1977).

Plaintiffs' central argument asserts that Rhode Island violates the general purposes of Pub.L. 81–874, and 20 U.S.C. § 240(d)(1) in particular, as follows:

14. State aid provided to a Rhode Island municipality which does not receive P.L. 874 aid is effectively calculated on the basis of its total actual expenditures, which are multiplied by its state share ratio. Tr. 137.

15. In the case of Middletown or any other Rhode Island community which receives P.L. 874 funds, state aid is calculated on the basis of its total actual expenditures, reduced, however, pursuant to G.L.1956, Section 16–7–20, by the amount of its actual expenditures from its P.L. 874 receipts. Tr. 26, 138–139.

16. Middletown would have received and would have been entitled to receive the sum of $503,101.00 more in state aid for the 1976–1977 fiscal year if its actual expenditures had not been reduced by the amount of its expenditures from P.L. 874 funds.

Pl. Brief at 5–6.

However, this argument is without foundation in analysis, and is supported only by the wording, "however, that expenditures from federal moneys in lieu of taxes shall not be counted." R.I.G.L. § 16–7–20. It may be that this is not a pellucid definition of "local effort." In terms of practical effect, it is apparent from the Rhode Island formula that Rhode Island does not substitute federal aid to impacted districts for state aid which would be otherwise received. Rhode Island does not compute its aid, and subsequently subtract from that aid Pub.L. 81–874 funds (or a portion of those funds).[10] *Compare Shepheard v. God-*

---

9. *See* Pub.L. 90–576, Title III, § 305 (October 16, 1968), 82 Stat. 1064 at 1097.

10. The amicus in its brief at page 17, gives the following example:

> For example, if the cost of the basic program for a Rhode Island LEA not receiving P.L. 81–874 payments were $100,000 and its reimbursement ratio were 50%, then it would receive $50,000 from State aid. If, however, the LEA had received and applied $20,000 of P.L. 81–874 payments to that basic program cost, then it would receive only $40,000 of State aid. Since the State would have excluded $20,000 from the reimbursement amount, it would only provide 50% of

the $80,000 remaining. In effect, the State has substituted $10,000 of the P.L. 81–874 payments for $10,000 of State aid and reduced the State effort. This is similar to the type of situation that the court in *Shepheard* faced. On the other hand, if the LEA were to have expended $120,000, including the P.L. 81–874 payment, there would be no substitution for State funds that would otherwise have gone to the LEA. The State, though excluding $20,000, would still pay its full share (50%) of the basic program cost and, thus, not effectuate a substitution. If the LEA expends more than its basic program cost, its own voluntary effort determines the

*win*, 280 F.Supp. at 869. And because Rhode Island places no ceiling on the locally raised expenditures which it will reimburse, there is no possibility that Pub.L. 81–874 funds have a substitutional effect by removing the incentive from local districts to increase their effort. *Compare Hergenreter v. Hayden, supra.* In short, the Rhode Island formula retains the supplementary character of Pub.L. 81–874 funds precisely as Congress intended, and comports with the letter and spirit of Congressional intent. *Shepheard* and its progeny are inapposite because Rhode Island seeks not simply to assist school districts, as did the states in those cases, but also to induce increased local effort by rewarding that effort with increased aid. Given that purpose, certainly not contrary to anything in Pub.L. 81–874, Rhode Island must have a definition of local effort; and it would be odd, to say the least, to define local effort as including federal aid.

In terms of the language Congress chose in 20 U.S.C. § 240(d)(1) to define those circumstances in which the purpose behind aid to impacted districts would be violated by state aid formulas, the Rhode Island formula clearly passes muster. The Rhode Island formula does not "take into consideration payments under this subchapter [Pub.L. 81–874] in determining the eligibility of any local educational agency in [Rhode Island] . . . or the amount of that aid." The formula applies the share ratio (derived without consideration of Pub.L. 81–874 funds) directly to the local effort figure (which by definition and logic cannot include impacted aid funds, and only "considers" those funds as an arithmetical device to calculate local effort, a "consideration" which is not what § 240(d)(1) proscribes.) [11]

amount of State aid that it will receive. At that point, the amount of P.L. 81–874 payments has no bearing on the amount of State aid allocated to the LEA.

In the instant case, it appears that Middletown is expending above its basic program cost from State and local sources, exclusive of P.L. 81–874 receipts. The 'mandated minimum program level' was $500 per pupil in ADM (average daily membership) for the school year in issue—1976–1977. Plaintiffs' Exhibit # 10, Defendants' Exhibit B. There were approximately 3660 pupils in ADM in Middletown schools for the school year 1976–1977. Comparative Analysis of Critical Data for 1977–78, Plaintiffs' Exhibit # 2. Thus, the basic program cost was approximately $1,830,000 plus transportation costs. No specific testimony seems to have been offered as to what the transportation costs were for Middletown for the year in issue. However, the Department of Health, Education and Welfare believes on the basis of information kept by the Middletown School Committee, that they would approximate $160,000 for 1976–1977. This would result in a "basic program" cost of approximately $1,990,000. It appears that the general education expenditures from local or State sources for Middletown for school year 1976–1977 are approximately $3,686,954 (total estimated expenditures less Federal payments less State categorical aid). Comparative Analysis of Critical Data for 1977–78, Plaintiffs' Exhibit # 2.

Since the expenditures from State and local funds would seem to clearly exceed the basic program cost, the P.L. 81–874 pay-

ments would not be required to be applied to meeting that mandatory minimum expenditure. Thus, Middletown received the full amount of State aid it otherwise would have received, i. e., if there had been no P.L. 81–874 payments. The fact that Middletown may have chosen to spend in excess of the mandated basic program expenditure was a matter of local choice, and, in fact, generated more State aid. Therefore, it appears that for school year 1976–1977, the State of Rhode Island did not take P.L. 81–874 payments into account in allocating State aid to Middletown in a manner which contravenes the purpose of P.L. 81–874 or the prohibition of section 5(d)(1) thereof. Whether the State might violate section 5(d)(1) in some other year is a question that would have to be decided on the facts pertinent to that year.

This conclusion is in accord with the position taken by USOE in ruling on the operation of the Rhode Island State aid statute in 1969. Defendants introduced at trial correspondence between USOE and the Rhode Island Department of Education relative to that determination. Defendants' Exhibit A.

11. Rhode Island could have defined local effort directly in the statute as school expenditure raised by the local property tax. A statute so worded clearly does not entail any "consideration" of Pub.L. 81–874 funds; and it would be bizarre to find such a statute permissible but to strike down the present statute, which is identical in practical effect.

Nor does the Rhode Island formula "result in less State aid to any local educational agency which is eligible for payments under this subchapter than such local educational agency would receive if it were not so eligible." 20 U.S.C. § 240(d)(1). If federal impacted aid funds were withdrawn tomorrow, Rhode Island's formula would not result in any increased aid for Middletown, an observation which by itself conclusively demonstrates that Rhode Island has not substituted federal funds for state aid. This result should be contrasted with the facts in *Shepheard* and its progeny, where withdrawal of federal aid would have directly resulted in increased state aid.[12]

Middletown relies heavily on an August, 1965 study prepared by the Office of Education, United States Department of Health, Education, and Welfare for the Senate Committee on Labor and Public Welfare, Subcommittee on Education, entitled "Impacted Areas Legislation Report and Recommendations." The study cited Rhode Island in a footnote as one of fifteen states which improperly reduced state aid to local districts by taking Pub.L. 81–874 funds into consideration in their aid formulas. The conclusions of this study were repeated without further analysis in the Report of the House Committee on Education and Labor in 1966, which commented:

> " 'Fifteen States offset the amount of Public Law 874 funds received by their school districts by reducing part of their State Aid to those districts. *This is in direct contravention to congressional intent.* Impact aid funds are intended to compensate districts for loss of tax revenues due to Federal connection, not to substitute for State funds the districts would otherwise receive.' "

1966 U.S.Code Cong. and Admin.News at 3878.

However, the Court agrees with the amicus United States that the Office of Education report is an inadequate base on which to predicate a Congressional finding as to the Rhode Island formula. There is no indication that Congress specifically focussed on the Rhode Island formula as offensive to the purposes of Pub.L. 81–874. Furthermore, the House committee cited the report at a time when the relationship between equalization formulas and Pub.L. 81–874 was not well understood. When the section at issue here, 20 U.S.C. § 240(d)(1) (1977), was enacted in 1968 to help clarify Congressional intentions, no reference to the "fifteen states" was made. The legislative history presented here is simply not clear enough to support the conclusion urged by plaintiffs. *Philbrook v. Glodgett*, 421 U.S. 707, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975).

Plaintiffs offer a second argument to show that the Rhode Island aid formula violates the intent of Pub.L. 81–874 or 20 U.S.C. § 240(d)(1). Middletown points out that while Pub.L. 81–874 payments are compiled and distributed on the basis of current enrollment figures (payments in any year being dependent on federally-connected children in the district during that year), state aid in Rhode Island is computed on the basis of data from two years prior to the year in which state aid is granted. Because Middletown's Pub.L. 81–874 funds have been declining, Rhode Island's deduction of 1974–1975 Pub.L. 81–874 funds from 1974–1975 total expenditures in computing 1976–1977 state aid seems to result in less state aid than would result from deducting current (smaller) 1976–1977 Pub.L. 81–874 funds from 1974–1975 expenditures.

■ Again, this argument misreads the thrust of the Rhode Island law. Impacted

---

12. It can be argued that if federal aid were withdrawn, Middletown taxpayers would decide to increase their taxes to maintain equivalent total expenditure, thus generating an increase in state aid. However, as the United States observes, this would be a speculative increase in state aid, as opposed to the clear indication in *Shepheard*, for example, of what would have happened if impacted aid payments were withdrawn. The inquiry mandated by § 240(d)(1) into whether Rhode Island makes aid available to Middletown in a way as to result in less state aid than Middletown would receive if it were ineligible for impacted aid, was clearly intended to be a relatively simple inquiry; forecasting precisely what might have happened at the yearly town financial meeting under various hypothetical circumstances would be impossible, and a strange basis on which to strike down a state statute.

aid funds are deducted from total expenditures solely as an arithmetical device to determine "local effort". Since the deduction does not have the effect of substituting federal funds for state funds which Middletown would otherwise receive,[13] Rhode Island cannot be prohibited from basing state aid to local districts on the basis of expenditures two years old, or on the basis of figures even older if it so chooses. *See San Antonio School District v. Rodriquez*, 411 U.S. 1, 41, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Los Alamos School Board v. Wugalter*, 557 F.2d 709 (10th Cir. 1977).[14] Since Rhode Island has chosen to aid local districts by reimbursing them according to the effort of each community, two years previously, and has chosen to define local effort as total expenditure less federal aid (a computation yielding local property taxation for education), it is apparent that the federal aid figure deducted from total expenditure must pertain to the same school year as the expenditure figure.

The Court has carefully examined the cases cited by the defendants. While the Court agrees with the reasoning and holding of those decisions, the facts of the instant case compel a different result. The United States, which has an interest in ensuring that Pub.L. 81–874 funds supplement and do not substitute for state aid, agrees that the Rhode Island law here challenged is not invalid under the Supremacy Clause. In accordance with the findings of fact and conclusions of law recited herein, the defendants shall present an order for the entry of judgment against the plaintiffs within ten days.

---

13. No contention is made, nor would the record permit a finding, that Rhode Island's decision to use two-year old figures for computing current state aid to communities throughout the state is based in any way on considerations arising from Pub.L. 81–874.

14. As early as 1953, Congress emphasized that Pub.L. 81–874 was not intended to change or influence the American tradition "of local control of education patterned to local desires and resources." H.R.Rep.No.703, 83rd Cong., 1st Sess., 5–6 (1953).