CITY OF PAWTUCKET et al.

v.

Bruce SUNDLUN et al.

CITY OF WOONSOCKET et al.

v.

Bruce SUNDLUN et al.

EAST GREENWICH SCHOOL
COMMITTEE et al.

v.

CITY OF PAWTUCKET et al.

Nos. 94–199–Appeal, 94–347–Appeal.
Nos. 94–203–M.P., 94–188–M.P.

Supreme Court of Rhode Island.

July 20, 1995.

Stephen Robinson, Katherine Merolla, Julie Underwood, Providence, for City of Pawtucket.

Ronald W. DelSesto, Peter Leach, James E. Bilodeau, Jr., Providence, for City of Providence.

Joseph V. Cavanagh, Jr., Michael P. DiBiase, Raymond A. Marcaccio, Providence, for East Greenwich School Committee.

Edward M. Fogarty, Providence, for John C. Revens et al.

Bradford A. Gorham, Providence, for Town of Westerly.

Bradford Gorham, Providence, for Exeter-West Greenwich School Dept.

Gregory Piccirilli, Cranston, for Foster Glocester Regional School.

Amato A. DeLuca, Lori L. Creswell, Providence, for Jamestown School Committee.

David J. Kehoe, Warwick, for South Kingstown School Committee.

Joseph S. Larisa, Jr., Patrick Augustus Guida, Suzanne Worrell Gemma, Providence, for Bruce Sundlun et al.

Edmund L. Alves, Jr., Providence, for Town of East Greenwich.

Lynette J. Labinger, Providence, Paul Minorini, Washington, DC, Helen Hershkoff, New York City, Patricia A. Brannan, Washington, DC, for amicus curiae ACLU.

James J. McGair, Providence, for amicus curiae Public Educ. Fund.

Gerald Resnick, Hackensack, NJ, Girard R. Visconti, Providence, for amicus curiae Health and Educ. Leadership for Providence.

Forrest L. Avila, Providence, for the Com'r. of Educ.

OPINION

LEDERBERG, Justice.

These consolidated cases have challenged the means by which the General Assembly fulfills its constitutional mandate to provide public education in Rhode Island. They present to this Supreme Court our first opportunity to review the charge of article 12 of the Rhode Island Constitution that the General Assembly promote public schools and secure to the people of this state the advantages and opportunities of education. For the reasons set forth, we hold that Rhode Island's current statutory scheme for financing public education does not violate either the education clause (article 12) or the equal-protection provision (article 1, section 2) of the State Constitution.

## Parties, Facts and Procedural History

On February 24, 1994, a justice of the Superior Court announced that Rhode Island's method of funding public education was unconstitutional. The Superior Court proceedings were initiated by three communities that objected to the state's 1991 appropriation for elementary and secondary education.[1] The plaintiffs in these actions included students, parents, taxpayers, and government representatives of the cities of Pawtucket, West Warwick, and Woonsocket, Rhode Island, as well as education officials and school committees in their respective school districts. The defendants included the Governor, the Lieutenant Governor, the Speaker of the House of Representatives, the President Pro Tempore of the Senate, the Board of Regents for Elementary and Secondary Education, the chairman of the Board of Regents, and the commissioner of Elementary and Secondary Education.[2] The plain-

1. Specifically, these cases were *City of Pawtucket et al. v. Bruce Sundlun et al.*, case No. 91-8644 (Pawtucket), filed December 27, 1991; *City of Woonsocket et al. v. Bruce Sundlun et al.*, case No. 92-588 (Woonsocket), filed January 29, 1992; *West Warwick School Department et al. v. State of Rhode Island et al.*, case No. 92-880 (West Warwick), filed February 10, 1992. On September 2, 1992, the West Warwick and Pawtucket parties consolidated their cases "for all purposes and for trial." On June 4, 1993, the trial justice entered an order granting Pawtucket's motion to consolidate with Woonsocket.

2. Specifically, the parties in case No. 91-8644 (Pawtucket) were the City of Pawtucket; Raymond W. Houle, Jr., individually and as Mayor of the City of Pawtucket; John Barry, president of the Pawtucket City Council; the Pawtucket School Committee; the chairman and the members of the Pawtucket School Committee, in their capacity as members of the school committee; Richard Charlton, in his capacity as superintendent of Pawtucket schools; and Gerald B. Resnick, individually and as parent and next friend of Matthew and Amy Resnick, students in the Pawtucket school system versus Bruce Sundlun in his capacity as Governor of the State of Rhode Island; Joseph DeAngelis, as Speaker of the

tiffs essentially sought a declaratory judgment that the state's method of funding public education was violative of the Rhode Island Constitution. The plaintiffs asked the Superior Court to direct defendants to devise, enact, and implement a system of aid to education that would fairly levy the taxes necessary to provide equal educational opportunities to students and that would assign educational resources as uniformly as was practical.

By agreement of the parties, the trial justice bifurcated the trial, separating issues of liability from those of remedies and damages. The justice of the Superior Court heard the case during a three-week period in May and June of 1993 and orally delivered a decision from the bench on February 24, 1994. The trial justice directed plaintiffs' counsel to prepare a judgment, and on March 14, 1994, the Superior Court entered a memorandum decision and judgment drafted by attorneys for plaintiffs. The judgment declared that

> "the Rhode Island school finance system violates the Education Clause of the Rhode Island Constitution, Article XII, as well as the Equal Protection and Due Process Clauses of the Rhode Island Constitution, Article 1, Section 2."[3]

The court severed and reserved for later decision the remedy and damages portion of the proceedings and retained jurisdiction of the case for the purpose of enforcing the judgment.

Subsequent to the entry of judgment, motions to intervene were filed by the Exeter-West Greenwich Regional School District, the town of East Greenwich, the East Greenwich School Committee, the Foster-Glocester Regional School Committee and the members of the Committee in their official capacities, and taxpayers and parents in the region (the East Greenwich intervenors).

In addition, the Bristol-Warren Regional School District and the Middletown School District orally moved to intervene, but the trial justice denied all motions to intervene. On March 31, 1994, these parties, with the exception of the Bristol-Warren and Middletown School Districts, filed an appeal, No. 94–199–A., from the order denying their intervention.

Also on March 31, 1994, the East Greenwich intervenors, joined by the Westerly School Committee and the South Kingstown School Committee, filed a petition with this court for issuance of a writ of certiorari, No. 94–188–M.P., to review the Superior Court's judgment. Subsequently, this court granted the petition for certiorari in case No. 94–188–M.P., and consolidated it for briefing and oral argument with the appeal in No. 94–199–A.

House of Representatives of Rhode Island; Roger N. Begin, as Lieutenant Governor of Rhode Island; John F. Correia, as President Pro Tempore of the Senate of Rhode Island; the Board of Regents for Elementary and Secondary Education; Frederick Lippitt, as its chairman, and Janice M. Baker, as acting commissioner of Elementary and Secondary Education; in case No. 92–588, plaintiffs were the city of Woonsocket; Francis L. Lanctot, individually and as Mayor of the City of Woonsocket; Robert J. Fontaine, president of the Woonsocket City Council; the Woonsocket School Committee; the chairman and the members of the committee in their capacity as members; Josephine Kelleher, in her capacity as superintendent of the Woonsocket schools; and John F. Ward, as parent and next friend of Patrick J. and Christopher J. Ward, students in the Woonsocket school system. The defendants in the Woonsocket case were identical to those in case No. 92–880 except that the State of Rhode Island is not a defendant in the Woonsocket case; and in case No. 92–880 (West Warwick) plaintiffs were the West Warwick School Department, the superintendent of schools of West Warwick, the School Committee of the Town of West Warwick and representative parents of students of the district, the Mayor of the Town of West Warwick, the president of the West Warwick Town Council, and the finance director of the town of West Warwick, all of whom, with the exception of the district itself, were qualified voters and taxpayers of the State of Rhode Island and of the Town of West Warwick versus the State of Rhode Island, Governor Sundlun, Speaker DeAngelis, Lieutenant Governor Begin, President Pro Tempore Correia, the Board of Regents, Chairman Lippitt, and Peter McWalters, Commissioner of Elementary and Secondary Education.

The subsequent substitution of elected and appointed officials sued in their official capacity in these proceedings does not alter the outcome of the issues before us.

3. Except in this statement, nothing in either the Superior Court's bench decision or its written-memorandum decision and judgment speaks to any due-process issues. Consequently, we shall not address the reference to the due-process clause.

Again on March 31, 1994, the Superior Court heard and denied a motion to intervene by the Jamestown School Committee (the Jamestown intervenors). On April 1, 1994, the Jamestown intervenors filed an appeal and a petition for certiorari with this court, No. 94–203–M.P. We granted the petition on May 5, 1994, and consolidated the case with the East Greenwich intervenors' petition, No. 94–188–M.P.

Also on April 1, 1994, the President Pro Tempore of the Rhode Island Senate filed an appeal, No. 94–347–A., from the judgment of the Superior Court.

While these cases were pending before this court, plaintiffs filed a motion to remand the papers in the proceedings to the Superior Court for a hearing on plaintiffs' pending petition for interim relief. On April 28, 1994, this court denied the motion to remand and pointed out that our grants of certiorari and the pending appeals deprived the Superior Court of jurisdiction to consider plaintiffs' requests via their petition for interim relief.

On June 27, 1994, the Mayor, Superintendent of Schools, and School Committee of the City of Providence petitioned to intervene as plaintiffs in these cases, and on July 15, 1994, this court granted their petition.

The plaintiffs also filed a motion to remand and for additional relief on June 13, 1995, that we denied on June 22, 1995.[4]

We begin our analysis of the constitutionality of the state's support of education by summarizing the standard of review that this court applies in construing statutory and constitutional provisions. We next address the scope and context of article 12 as reflected in the constitutional provisions and legislative enactments on educational funding. After reviewing the decision of the Superior Court, we proceed with our analysis of plaintiffs' challenge to the education clause and the equal-protection provision of the Rhode Island Constitution.

## Standard of Review for Legislative Enactments

 Government in Rhode Island operated under the royal charter granted in 1663 by Charles II until the State Constitution went into effect in 1843. William G. McLoughlin, *Rhode Island, A History*, ch. 4 at 135 (1978). Since the adoption of the constitution, this court has consistently held that the powers of both the Crown and Parliament reside in the Legislature, unless that power has been subsumed by the Constitution of the United States or has been removed from the General Assembly by the Constitution of the State of Rhode Island. *Kennedy v. State*, 654 A.2d 708, 710 (R.I. 1995). The power of the General Assembly is, therefore, plenary and unlimited, save for the textual limitations to that power that are specified in the Federal or State Constitutions. *Kass v. Retirement Board of the Employees' Retirement System of Rhode Island*, 567 A.2d 358, 360 (R.I.1989). The State Constitution defines the powers granted to the executive and judicial departments of government, leaving all other powers to the legislative branch, unless prohibited to it by the constitution. *City of Providence v. Moulton*, 52 R.I. 236, 241, 160 A. 75, 77 (1932). Because the General Assembly does not look to the State Constitution for grants of power, we have invariably adhered to the view that the General Assembly possesses all the powers inherent to the sovereign other than those that the constitution textually commits to the other branches of state government. *Kass*, 567 A.2d at 361. Any powers not so committed are powers reserved to the General Assembly. *Id.* (quoting *Nugent v. City of East Providence*, 103 R.I. 518, 525–26, 238 A.2d 758, 762 (1968)).

 Because of the broad plenary power of the General Assembly, this court's evaluation of legislative enactments has been extremely deferential; moreover, we have interfered with such enactments only when the legislation at issue could palpably and unmistakably be characterized as an excess of leg-

4. In addition to the briefs and documents submitted by the parties and the extensive record compiled during the Superior Court trial, the court gratefully acknowledges the briefs filed as amici curiae in support of plaintiffs by the Health and Education Leadership for Providence; the Rhode Island Affiliate, American Civil Liberties Union, and the American Civil Liberties Union; and the Public Education Fund.

islative power. *Kennedy*, 654 A.2d at 711. Specifically, this court will not invalidate a legislative enactment unless the party challenging the enactment can prove *beyond a reasonable doubt* to this court that the statute in question is repugnant to a provision in the constitution. *Gorham v. Robinson*, 57 R.I. 1, 7, 186 A. 832, 837 (1936). Thus, all laws regularly enacted by the Legislature are presumed to be constitutional and valid. *Id.* Moreover, this court

> "will make every reasonable intendment in favor of the constitutionality of a legislative act, and so far as any presumption exists it is in favor of so holding." *State v. Garnetto*, 75 R.I. 86, 94, 63 A.2d 777, 781 (1949).

### Standards for Construing Constitutional Provisions

 Our task in construing constitutions is to give effect to the intent of the framers. *State ex rel. Webb v. Cianci*, 591 A.2d 1193, 1201 (R.I.1991). In so doing, we employ the well-established rule of construction that when words in the constitution are free of ambiguity, they must be given their plain, ordinary, and usually accepted meaning. *In re Advisory Opinion to the Governor*, 612 A.2d 1, 7 (R.I.1992). Every clause of the constitution must be given its due force, meaning, and effect, and no word or section can be assumed to have been unnecessarily used or needlessly added. *Id.* (quoting and citing *Kennedy v. Cumberland Engineering Co.*, 471 A.2d 195, 198 (R.I.1984)). This court presumes that the language in a clause was carefully weighed and that the terms imply a definite meaning. *Bailey v. Baronian*, 120 R.I. 389, 391, 394 A.2d 1338, 1339 (1978) (citing *Opinion to the Governor*, 62 R.I. 316, 6 A.2d 147 (1939)).

 In construing a constitutional provision, this court properly consults extrinsic sources, including the proceedings of constitutional conventions and any legislation related to the constitutional provision that was enacted at or near the time of the adoption of the constitutional amendment. *Cianci*, 591 A.2d at 1201. And finally, in our examination of the constitution, we must look to the history of the times and examine the state of affairs as they existed when the constitution

was framed and adopted. *Opinion to the Governor*, 612 A.2d at 8 (quoting *In re Advisory Opinion (Chief Justice)*, 507 A.2d 1316, 1320 (R.I.1986)).

### Public Education in Rhode Island: Statutory and Constitutional Beginnings

The history of public education in Rhode Island is long and complex, given that in the 1640s Newport was, it is believed, the first town in English Colonial America to establish a public school. *See* Charles Carroll, *Public Education in Rhode Island* ch. I at 14 (1918). Although early records of the colonial period are incomplete and fragmentary, records that did survive demonstrate that although no town established schools totally at the expense of taxpayers, the towns did assist and encourage public education by granting house lots for schoolmasters, land for school sites, and income from tracts of land for school support; by building school houses as public property; by the employment of town schoolmasters with at least some salary; and by grants of school sites or money to groups of inhabitants who organized as school societies to maintain quasi-public schools. *Id.* at 33–34. The schools that were established were not free schools. *Id.* at 34. The towns' efforts, however, did result in at least one fee-charging school in each town by the end of the eighteenth century. *Jamestown School Committee v. Schmidt*, 122 R.I. 185, 202, 405 A.2d 16, 25 (1979) (Kelleher, J., concurring).

In 1795, John Howland, a member of the Providence Association of Mechanics and Manufacturers, spearheaded the effort to establish free schools. *Id.* By 1799, the association eloquently petitioned the General Assembly on behalf of free schools, arguing in language that is evocative of article 12 of the State Constitution:

> " 'That the means of education which are enjoyed in this state are very inadequate to a purpose so highly important. That numbers of the rising generation whom nature has liberally endowed, are suffered to grow up in ignorance, when a common education would qualify them to act their

parts in life with advantage to the public and reputation to themselves.

\* \* \* \* \* \*

[L]iberty and security under a republican form of government depend on a general diffusion of knowledge among the people.' " Carroll, ch. II at 77–78.

As a result of the petition, the General Assembly passed "An Act to Establish Free Schools" in March 1800 (act of 1800). *Schmidt*, 122 R.I. at 203, 405 A.2d at 26 (Kelleher, J., concurring). The act of 1800 stated:

> " 'Be it enacted by the General Assembly and the authority thereof, and it is hereby enacted: That each and every town shall annually cause to be established and kept, at the expense of such town, one or more free schools for the instruction of all the white inhabitants of said town between the ages of six and twenty years in reading, writing and common arithmetic, who may stand in need of said instruction and apply therefor.' " Carroll, ch. II at 80.

Section 4 of the act provided that towns that complied were entitled to receive a remission of 20 percent of the taxes paid by the town to the state, and section 5 instructed that the remittances should be used exclusively for school support. *Id.*

The act of 1800, however, was a failure. Only Providence and Smithfield complied with its provisions, and several towns protested it. *Id.* at 81. Although the act was repealed in 1803, Providence continued to operate a system of free schools. *Id.*

During the next twenty-five years, proposals for free public education in Rhode Island did not fare well. In 1818, Governor Nehemiah R. Knight proposed the establishment of public schools for youth employed in factories. The committee he appointed to consider the recommendation rejected the proposition as inexpedient. *Id.* at 82. A General Assembly committee appointed in 1821 for the purpose of collecting school statistics failed to report. A proposed constitution that provided for a permanent school fund was rejected in 1824. And when, in 1825, the General Assembly referred a proposed act for the establishment of lotteries for the "purpose of raising a fund for the support of free schools" to its next legislative session, the issue was not revived. *Id.* ch. III at 85.

Nevertheless, agitation for a statewide system for free public schools continued, particularly by the state's newspapers. In 1828 the General Assembly again undertook the promotion and establishment of free public schools throughout the state by enacting "An Act to Establish Public Schools" (1828 act). The 1828 act, § 1, appropriated up to $10,000 from lotteries and from fees obtained from auctioneers to be set aside and distributed "to the several towns in this state \* \* \* in proportion to their respective population under the age of sixteen years \* \* \* for the exclusive purpose of keeping public schools, and paying the expenses thereof." Section 2 of the 1828 act provided:

> "[E]ach town shall be and is hereby empowered to raise so much money, by tax in each year, as a majority of the freemen in town-meeting shall judge proper, to be appropriated to the purposes of public schools, not exceeding, in any one year, double the amount to be in that year received by such town out of the general treasury, by the provisions of this act."

Section 8 of the 1828 act also "appropriated and set apart the sum of five thousand dollars for the commencement and formation of a permanent fund, for the support of public schools."

In 1839, the General Assembly revised, but did not fundamentally change, the legislation relating to public schools. The annual appropriation was raised to $25,000, and income received on surplus federal funds deposited with the state was allocated to the support of the public schools. *Schmidt*, 122 R.I. at 205, 405 A.2d at 26–27 (Kelleher, J., concurring).

Although school policy was not an issue in the political turmoil that culminated in Dorr's rebellion, *see* Carroll, ch. III at 120, the state's attitude toward public education was revealed in the conflagration that resulted. The People's Constitution of 1841–1842, adopted by the followers of Thomas Wilson Dorr, "contained an uncompromising declaration favoring public education and 'free schools.' " *Id.* at 121. Specifically, it provided:

> " '*People's Constitution*—The diffusion of knowledge, and the cultivation of a sound

morality in the fear of God being of the first importance in a republican State, and indispensable to the maintenance of its liberty, it shall be an imperative duty of the Legislature to promote the establishment of *free* schools and to assist in the support of public education.—Declaration of Rights and Principles, No. 5.

" 'Article XII.—Of Education.—Sec. 1. All moneys which now are or may hereafter be appropriated by the authority of the state to public education shall be securely invested and remain a perpetual fund for the maintenance of free schools in this state; and the General Assembly shall be prohibited from diverting said moneys or fund from this use * * *. But the income derived from said moneys or fund *shall be annually paid* over by the General Treasurer *to the towns and cities* of the state for the support of said schools, *in equitable proportions.*' " (Emphases added.)

Carroll, ch. III at 121–22.

In contrast, the Landholders' Constitution, adopted on February 18, 1842, by a constitutional convention called by the General Assembly, but rejected by freemen in March 1842, addressed public education in Rhode Island as follows:

### Landholders' Constitution: Article XII—Of Education.

"Section 1. The diffusion of knowledge, as well as of virtue, among the people, being essential for the preservation of their rights and liberties, it shall be the duty of the General Assembly to promote public schools, and to adopt all other means to secure to the people the advantages and opportunities of education, which they may deem necessary and proper.

"Sec. 2. The money which now is, or which may hereafter be appropriated by law for the formation of a permanent fund for the support of Public Schools, shall be securely invested and remain a perpetual fund for that purpose.

"Sec. 3. All donations for the support of Public Schools or for other purposes of education, which shall be received by the General Assembly, shall be applied according to the terms prescribed by the donors.

"Sec. 4. The General Assembly shall make all necessary provisions by law for carrying this Article into effect. They are prohibited from diverting said moneys or fund from the aforesaid uses, and from borrowing, appropriating or using the same, or any part thereof, for any other purpose under any pretence, whatsoever." Landholders' Constitution 1842.

The Landholders' Constitution clearly attempted to impose upon the General Assembly a duty to promote public schools, but it equally clearly granted broad and discretionary power to the Legislature "to adopt all other means to secure to the people the advantages and opportunities of education, which *they* may deem necessary and proper." (Emphasis added.) *Id.* The Landholders' Constitution, however, did not require that public schools be free or that the distribution of state funds to the several cities and towns be equitable or available to the cities and towns for the promotion of public schools.

The constitution that was finally adopted in November 1842—after Dorr's rebellion had been snuffed out—"contained an article entitled 'Of Education,' which in phraseology varied but slightly from article XII of the Landholders' Constitution." Carroll, ch. III at 123–24. Specifically, the State Constitution of 1842 provided:

### "Article XII. *Of Education.*

"Sec. 1. The diffusion of knowledge, as well as of virtue, among the people, being essential to the preservation of their rights and liberties, it shall be the duty of the general assembly to promote public schools, and to adopt all means which they may deem necessary and proper to secure to the people the advantages and opportunities of education.

"Sec. 2. The money which now is, or which may hereafter be appropriated by law for the establishment of a permanent fund for the support of public schools, shall be securely invested, and remain a perpetual fund for that purpose.

"Sec. 3. All donations for the support of public schools or for other purposes of education, which may be received by the

general assembly, shall be applied according to the terms prescribed by the donors.

"Sec. 4. The general assembly shall make all necessary provisions by law for carrying this article into effect. They shall not divert said money or fund from the aforesaid uses, nor borrow, appropriate, or use the same, or any part thereof, for any other purpose, under any pretence whatsoever."

Thus, although the drafters of the 1842 Constitution did not evince an intention that the General Assembly fundamentally change its promotion or financing of public education in the state, in 1843, the year the constitution became effective, the General Assembly enacted legislation that authorized the Governor to appoint an individual to be charged with the responsibility of surveying the state of public education in Rhode Island and reporting back to the General Assembly. For this task, Governor James Fenner chose Henry Barnard, "without question the foremost American educator of the nineteenth century." Carroll, ch. IV at 129. Barnard's subsequent report contained a series of recommendations on restructuring the school system in Rhode Island.

In response, in June 1845 the General Assembly enacted the so-called Barnard School Act, entitled "An Act Relating to Public Schools." The Barnard School Act did not increase the annual state appropriation for distribution to the towns for the support of public schools but continued to provide the same level of state funding that had been established in 1839, namely, $25,000 per year. Barnard School Act, pt. I, Sec. II. The Barnard School Act did, however, attempt to promote greater *local* financing of public schools. Whereas the 1828 and 1839 acts had imposed limitations upon the local taxes a town could raise for school purposes, the Barnard School Act conditioned each town's eligibility to receive state funds upon that town's raising by local taxation a *minimum* proportion of funding for public schools:

"[A] sum equal to one third of the amount received from the General Treasury for the support of public schools for the year next preceding, shall be raised, before any town shall be entitled to receive its propor-

tion of the annual State appropriation." Barnard School Act, pt. 2, Sec. IV, ¶ 3.

At trial in Superior Court, plaintiffs' expert testified that under the Barnard School Act, towns continued to have the option to forgo operation of public schools entirely. He also noted that the Barnard School Act's removal of the spending cap permitted some cities to spend much more than other towns, resulting theoretically in a wide disparity of funding among communities. The expert further testified that the State Constitution of 1842 did not require that schools be established throughout the state or that equal expenditures for education be made by each town. Even after revision of the Barnard School Act, "[a]s a matter of fact and of law, neither act imposed any enforceable obligation upon the towns; the coercion that the state might exercise in compelling town support of schools was limited to requiring application of state school money to the purposes for which it was distributed, and the withholding of state school money for failure to raise by taxation at least one-third as much as the state apportioned." Carroll, ch. IV at 144.

Thus, neither the 1842 Constitution nor the Barnard School Act reflects an intent to create a system that required equitable school funding or that mandated public schools in every town in the state. In 1881 this court observed:

"The statutes of this State relating to free public schools do not make it the imperative duty of the several towns and cities to establish and maintain such schools, but create a general school system under which the several towns and cities voluntarily establish and maintain public schools, receiving from the State certain allotments of money to help defray the cost of instruction." *Wixon v. City of Newport,* 13 R.I. 454, 457–58 (1881).

Not until 1882 was the duty of towns to support public schools made mandatory by the General Assembly: "in the Public Statutes the words '*shall maintain*' replaced the words '*may maintain,*' and the town system of schools became a state system, at last." Carroll, ch. IV at 145.

If we view these constitutional and statutory provisions relating to education in the

context of the times in which they were adopted, it is clear that disparities in funding per pupil were simply not a concern to those who drafted the provisions. State appropriations for public schools increased from $25,-000 in 1844 to $126,747 in 1894 while town appropriations rose from $25,500 to $966,594 during the same period. *Id.* ch. V at 216. The historical evidence from the initial statutory and constitutional texts does not suggest that these funds were intended to be equally divided among the towns. As plaintiffs' witness noted at trial, the "concept of equal compensation, equal payment, is a new concept, relatively new concept." Therefore, we are constrained to conclude that, given the context of the times in which it was adopted, article 12, section 1, does not appear to have imposed on the General Assembly any new, measurable, or judicially enforceable duties to support education beyond those then extant. To suggest that the 1842 Constitution imposed upon the General Assembly a duty to compensate for a town's inability to raise local taxes is wholly unreasonable, given that towns were not required to fund such endeavors at all.

### The Constitutional Convention of 1986

Although it might be argued that article 12 may have evolved over the years to require or prohibit in the late twentieth century, acts that were not required or prohibited a century and a half earlier, we are of the opinion that article 12, section 1, of the State Constitution does not embody an intent different from that incorporated into that section by the framers in 1842. We have come to this conclusion because the people of this state have had the occasion to revisit, reconsider, and revise not only article 12, section 1, but every provision of the State Constitution when they met in constitutional convention most recently in 1986.

By 1986, the United States Supreme Court's decision in *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), was thirteen years old. *Rodriguez* held that a right to education is neither explicitly nor impliedly afforded protection under the Federal Constitution. *Id.* at 35, 93 S.Ct. at 1297, 36 L.Ed.2d at 44. School-funding issues had

been litigated in at least seventeen state courts by 1986. *See Abbott v. Burke,* 119 N.J. 287, 313–14, 575 A.2d 359, 372–73 (1990). Against the history and context of the times as they existed when the constitution was framed and adopted, *Advisory Opinion to the Governor,* 612 A.2d at 8, it is inconceivable that the delegates to the constitutional convention were oblivious or ignorant of the numerous constitutional challenges to school finance provisions across the country.

Indeed, the proceedings of the convention demonstrated that the delegates were amply aware of these issues. Numerous resolutions were introduced at the convention which, had they been adopted, would have explicitly amended article 12, section 1, to impose precisely the duties and restrictions that plaintiffs now urge us to adopt. For example, resolution No. 86–0081 directed the General Assembly to provide, to the extent possible, "an equal opportunity for an education on a per capita basis" and would have mandated, as did resolution No. 86–270, that public education in Rhode Island be financed entirely from appropriations from the state budget. Resolution No. 86–205 would have amended article 12, section 1, to require that "Children in the state shall be guaranteed an equal education regardless of their community of residence"; resolution No. 86–122 proposed that all funds for education be appropriated on an "equal basis," and resolution No. 86–125 introduced a number of funding methods to finance education.

The clause the constitutional convention finally adopted, however, was, for our purposes, essentially identical to the provision in the 1842 Constitution. The 1986 education clause reads:

"ARTICLE XII OF EDUCATION

"**Section 1. Duty of general assembly to promote schools and libraries.**—The diffusion of knowledge, as well as of virtue among the people, being essential to the preservation of their rights and liberties, it shall be the duty of the general assembly to promote public schools and public libraries, and to adopt all means which it may deem necessary and proper to secure to

the people the advantages and opportunities of education and public library services.

"**Section 2. Perpetual school fund.—** The money which now is or which may hereafter be appropriated by law for the establishment of a permanent fund for the support of public schools, shall be securely invested and remain a perpetual fund for that purpose.

"**Section 3. Donations.—**All donations for the support of public schools, or for other purposes of education, which may be received by the general assembly, shall be applied according to the terms prescribed by the donors.

"*Section 4. Implementation of article—Diversion of funds prohibited.—*The general assembly shall make all necessary provisions by law for carrying this article into effect. It shall not divert said money or fund from the aforesaid uses, nor borrow, appropriate, or use the same, or any part thereof, for any other purpose, under any pretence whatsoever."

The convention's adoption of article 12, section 1, signifies that the framers of the 1986 Constitution did not intend to alter the state's approach to funding education or to impose new constitutional requirements upon the General Assembly in respect to education. Article 12 of the 1986 Constitution, except for addition of the provisions on public libraries, is substantively identical to article 12 of the 1842 Constitution. The constitutional convention retained language that expressly and unequivocally assigned to the General Assembly the sole discretion "to adopt all means which *it* may deem necessary and proper" in the promotion of public schools. (Emphasis added.) The framers of the 1986 Constitution had the opportunity to radically alter the nature of the state's role in public education. They chose not to do so. Instead they recommended to the voters essentially the same provision on education that inhered in the State Constitution of 1842, and that provision was approved by the voters in November 1986.

5. The quantitative information in this section was adopted from *Description of State Aid Programs*, Rhode Island Department of Elementary

Moreover, in no measure did the 1986 Constitution alter the plenary and exclusive powers of the General Assembly. In fact, the 1986 Constitution provided that:

"The general assembly shall continue to exercise the powers it has heretofore exercised, unless prohibited in this Constitution." Art. 6, sec. 10.

Among the powers the General Assembly had exercised prior to the adoption of the 1986 Constitution was the power to promote public education through a statutory funding scheme and through reliance on local property taxation. The ratification of article 6, section 10, of the Rhode Island Constitution of 1986 represented a knowing and an express endorsement of the Legislature's primacy over education. Article 6, section 10, "must be construed to constitute a reaffirmation of the powers historically exercised by the Legislature under the prior constitution." *Kass*, 567 A.2d at 361. It is thus clear that the General Assembly's plenary and exclusive power over public education in Rhode Island has not changed since the adoption of the State Constitution in 1842.

### Funding in the Twentieth Century

During the early 1900s, the General Assembly enacted statutes, for example, that provided increased support to towns that established high schools or that hired "expert" superintendents. Minimum teachers' salaries and pensions were adopted. By the mid-1950s, state funding for public schools comprised twelve categorical programs that often competed for funds and that failed to provide reliable support.[5] In 1955 the Foundation Program Act attempted to meet the needs of the times by funding a $17 per pupil flat grant plus $200,000 for equalization among communities. Funding under that act was increased until the passage of the Foundation Level School Support Act of 1960. The 1960 act provided so-called operations aid under a state program that reimbursed a portion of each community's cost of public education. In the preamble to the act, the General Assembly stated that:

and Secondary Education, September 1992 and September 1994, Appendix B.

"The purpose of this act is to provide a quality education for all Rhode Island youth by requiring a minimum per pupil expenditure level, by encouraging school committees to provide superior education beyond this minimum, by identifying fiscal responsibilities of school committees, by further improving the efficiency of our school systems through encouraging small school districts to combine into larger, more efficient regionalized units, and by incorporating the many various state aids into one comprehensive program." P.L. 1960, ch. 27, § 1.

The operations-aid program is a function of two major variables: the proportion of total expenditures of all communities that will be reimbursed by the state and the proportion of each community's expenses that will be reimbursed by the state. G.L. 1956 § 16–7–20, as enacted by P.L.1960, ch. 27, § 6.

Although several specific categorical programs continue to fund special education, vocational education, and school housing, for example, operations aid has been, since its enactment, the primary program of state support for public education in Rhode Island. In 1995, of the $380.3 million in state funds appropriated in support of elementary/secondary education, $251.8 million, or 66 percent, was provided to communities through operations aid. The specific amount of aid reimbursed to each city, town or regional school district is called the state-share entitlement for the community. That amount is $RE$ when

$$R = 1.00 - 0.50X \times \frac{vM}{Vm},$$

such that $R$ = the "share ratio" for the community in a given fiscal year;

$E$ = the reimbursable expenses of the community for the reference year minus certain income;

$1$ = the total, or the state plus the local share;

$0.5$ = the average statewide fraction of local school expenses that are paid by the state; this has been set at 50%;

$v$ = adjusted equalized weighted assessed valuation for the community, which is the district property value or wealth factor used in the formula;

$m$ = average daily membership of public school students in the community, which is the district student count factor used in the formula;

$V$ = the sum of all the community adjusted equalized weighted assessed valuations, which is the state wealth factor used in the formula; and

$M$ = total average daily membership of pupils in the state, which is the state student count factor used in the formula.

G.L.1956 (1988 Reenactment) § 16–7–20, as amended by P.L.1994, ch. 331, § 1.

The share ratio is calculated on the basis of each school district's ability to pay for education by comparing the wealth per student of the district to the wealth per pupil of the state. The total of reimbursable expenses, $E$, is multiplied by the share ratio to yield the reimbursement to the community through operations aid. The share ratio, $R$, for a given community can also be represented essentially as follows:

$$\text{Share ratio} = 1 - 0.50 \times \frac{\text{assessed valuation per pupil in local district}}{\text{assessed valuation per pupil in the state}}$$

---

*See Middletown School Committee v. Board of Regents,* 439 F.Supp. 1122, 1123 (D.R.I. 1977).

### Recent Legislative Amendments to Operations Aid

Thus, under the operations-aid program, the state's share of a community's education-al costs is inversely related to that community's wealth: the wealthier the community, the smaller the state's reimbursement to that city, town or school district. The principle behind the state-aid formula is that the state

should bear a larger share of the cost of education in the poorer school districts than in wealthier communities. The 1960 act, however, mandated a minimum-share ratio of 25 percent for each community, irrespective of the community's wealth, and thus had the effect of disequalizing state funding (P.L. 1960, ch. 27, § 6). The state's minimum share of each community's educational costs was increased to 30 percent in 1964 (P.L. 1964, ch. 242, art. VII, § 1) but lowered to 28 percent in 1983, (P.L.1983, ch. 167, art. VII, § 1). In 1988–1989, nine communities received state aid at the then-effective minimum-share ratio of 28 percent even though five of these nine communities had an actual share ratio under 5 percent. Frank A. Pontarelli, Rhode Island Department of Education, *An Evaluation of State Aid to Education Formulas* 15 (1991).

In recent years, however, the Legislature has taken several steps recommended by the 21st Century Education Commission (21st C. Commission)[6] that have increased the equity of the state's support of education. Specifically, the General Assembly (1) reduced and subsequently eliminated the state's minimum-share-ratio reimbursement in the computation of state aid to local communities, (2) eliminated the cost of transportation as a factor in the operations-aid formula, (3) ceased including the number of nonpublic school students in the calculation of state aid, and (4) imposed restrictions on the granting of extra funding for regionalizing school districts.

The minimum-share ratio was decreased to 25 percent in 1991 (P.L.1991, ch. 44, art. 39, § 1) and one year later was further reduced to 15 percent for fiscal year 1992–1993 and to 9 percent for subsequent years (P.L.1992, ch. 133, art. 43, § 1). Finally, in 1994, the minimum-share ratio provision was eliminated altogether (P.L.1994, ch. 70, art. 15, § 1), thereby affording even greater equity in operations aid. Consequently, affluent communities capable of raising adequate educational

funds now qualify for little or no state reimbursement.

The Legislature also has removed the cost of transportation as a factor in determining the state's reimbursement to communities. Prior to 1992, a community's basic education program included the cost of students' transportation. G.L.1956 (1988 Reenactment) § 16–7–20, as amended by P.L.1991, ch. 44, art. 39, § 1. Communities with high transportation costs incurred increased basic program costs, and would therefore receive a higher state share than communities with lower transportation costs. Moreover, the inefficiencies in a district's transportation system that led to the higher costs were rewarded by an increase in the state's reimbursement. Transportation costs had a disequalizing effect because as transportation costs rose, the wealth factors became less significant in the formula. *Pontarelli, supra,* at 12–13. By including the cost of transportation, a greater share ratio resulted in at least ten districts considered socio-economically middle class. *Id.* at 12. In 1992, the Legislature amended § 16–7–20 to remove transportation cost as a factor in calculating the state's share ratio and thus further increased the equity of state funding. P.L.1992, ch. 133, art. 43, § 1.

Prior to fiscal year 1974, the calculation of the state's share ratio was based, in part, on the number of public school pupils (pupil count) in each community. G.L.1956 (1969 Reenactment) § 16–7–22, as amended by P.L.1972, ch. 197, § 1. The larger the pupil count, the higher the state's share. Beginning in fiscal year 1974, communities could receive the greater of two share-ratio calculations: one that included only the number of public school pupils and the other that included pupils from public, private, and parochial schools. P.L.1972, ch. 197, § 1. Thus, communities in which many students attended non-public schools could benefit from the option by selecting the calculation that resulted in the greater share ratio. This option benefited nine districts in fiscal year 1992, the year the Legislature amended the

---

6. The 21st Century Education Commission was created by the General Assembly at the request of the Governor and was directed by the FY 1992 Appropriations Act to design a plan to meet the educational needs of the state. Its report, *Educating ALL Our Children,* was issued in March 1992.

law to permit only public pupil enrollment to be used in the determination of the state's share ratio. P.L.1992, ch. 133, art. 43, § 1.

Since colonial times, school districts in Rhode Island have coincided with the geographical boundaries of cities and towns. However, with the enactment of the Foundation Level School Support Act in 1960, the state sought to increase the efficiency and effectiveness of school programs by encouraging consolidation of school districts, and through the granting of bonuses for regionalization of school programs. Section 16–7–20, as enacted by P.L.1960, ch. 27, § 6. Regionalized districts received a bonus in addition to the reimbursement based on their share ratios. The regionalization bonuses exacerbated funding disparities because regionalized districts, regardless of their wealth, received the bonus. Beginning in fiscal year 1993, the Legislature restricted the bonus to districts that include a "distressed community," defined according to criteria approved by the board of regents. P.L.1992, ch. 133, art. 43, § 1. In 1994, the General Assembly removed the "distressed community" qualification and instead granted bonuses for fiscal year 1994 to four named regional districts (Bristol–Warren, Exeter–West Greenwich, Foster–Glocester, and Chariho). P.L.1994, ch. 331, § 1.

In addition to these changes, the Legislature, in 1993, established a "distressed district fund" to provide additional aid to communities meeting certain criteria. G.L.1956 (1988 Reenactment) § 16–7–20.4, as enacted by P.L.1993, ch. 138, art. 77, § 3. The funds so distributed were restricted to "public school purposes only." *Id.* In fiscal year 1995, three communities (plaintiff communities Pawtucket, West Warwick, and Woonsocket) received aid totaling $1.7 million from this fund. Section 16–7–20.4, as amended by P.L.1994, ch. 70, art. 15, § 1. In 1994, the General Assembly appropriated $46 million in "poverty weight" aid to districts on the basis of the number of their students eligible for free and reduced-price lunches. Section 16–7–20(g), as amended by P.L.1994, ch. 331, § 1 (has been redesignated as subsection (g) from subsection (h) in the public laws). In addition, in 1994 the Legislature mandated

that all state funds appropriated for educational purposes be used for those purposes only. Section 16–7–20(f), as amended by P.L.1994, ch. 331, § 1 (redesignated as subsection (f) from subsection (g)). The amendment was directed at curbing the diversion by some communities of state educational funds to other local services, a practice that even the act of 1800 attempted to restrain by directing that state remittances be used exclusively for education. *See ante.*

Thus, since 1992 the Legislature has taken a series of steps to increase the equity of educational funding. In addition to modifying the operations-aid formula to eliminate disequalizing factors, the General Assembly has implemented several special-aid programs that specifically assist poor communities. Some of these legislative enactments occurred during the litigation of this case, and others were enacted after the Superior Court had issued its decision.

Throughout the decades since the adoption of the operations-aid program, educational spending by the state and by the cities and towns rose dramatically. Between the 1979–1980 school year and the 1989–1990 school year, public school spending by communities increased 100.4 percent during the same time that state spending increased 155.4 percent. Concomitantly, the state's reimbursement to communities of total educational costs statewide rose from 39.5 percent in 1983 to 52.3 percent in 1991. On January 1, 1991, however, the Governor of Rhode Island announced the closing of forty-five credit unions and banks after concluding that their private deposit insurer was insolvent. Significant economic disruption affected Rhode Island, resulting in severe economic distress to citizens and to the state treasury. Faced with an unprecedented state budget deficit, the General Assembly, for the first time, "capped" the operations-aid law by providing for a ratable reduction in each district's entitlement in any year that the program was not fully funded. *Description of State Aid Programs 1994,* at B–6. A direct consequence of the capping was the overall reduction in reimbursement for operations aid from 52.3 percent in 1991 to 38.1 percent in 1992, re-

sulting in reduced state funding to plaintiffs' communities. These cases ensued.

## The Superior Court Decision

The trial in the Superior Court was held during a three-week period in which more than thirty witnesses were heard and more than 1,400 pages of testimony were recorded. At trial, plaintiffs contended that the state's system of financing public education violates the education clause as well as the equal-protection and due-process guarantees of article 1, section 2, of the State Constitution. The defendants, on the other hand, argued that the education clause does not guarantee a right to education but only a right to have the General Assembly address and formulate a system of education. Moreover, according to defendants, because the means or methods devised by the General Assembly to finance public education are specifically within the power of the Legislature and because the state has a compelling interest in delegating the control of education to local communities, the funding scheme does not violate the equal-protection clause.

The trial justice began his analysis of the education clause by acknowledging that there is no constitutional right to an education under the Constitution of the United States and that "if a constitutional right to an education attaches to the privilege of citizenship, it does so under the Constitution of each state." After examining the history of our State Constitution and comparing the language of the Rhode Island education clause to the language of similar provisions in the constitutions of Kentucky and Massachusetts, the trial justice concluded that under the Rhode Island Constitution, education is a "fundamental and constitutional right" which "each child has as a resident of Rhode Island * * * and that right is to an opportunity to receive an equal, adequate, and meaningful education." The basis of the trial justice's conclusion was his observation that the use of the word "promote" in the education clause was similar to "the Jeffersonian use of the language that schools be provided and that they be available on an equitable basis and that those schools, when established have a meaningful purpose."

In holding that the education clause guarantees a right to an "equal, adequate, and meaningful" education, the trial justice adopted the definition of "equity" contained in the 21st Century Education Commission Report:

"Equity shall be defined as the equal treatment of students and taxpayers. It shall mean that a sufficient amount of money is allocated to enable all students to achieve learner outcomes and that tax burdens shall be based upon the ability to pay. It shall further mean that money spent for a child's education shall not be a function of district wealth and that all students shall have the same educational opportunities. The quality of education provided must be a function of statewide wealth."

The trial justice also adopted the standard of "adequacy" as enunciated by the Supreme Court of Kentucky and the Supreme Judicial Court of Massachusetts and went on to hold that the school financing system in Rhode Island violated the education clause, presumably because it failed to provide an "equitable and adequate" education for all children in the state.

In his equal-protection analysis, the trial justice made the following findings: the variation in the taxable wealth of different communities had resulted in disparate revenue per pupil; the low level of state funding failed to ensure "substantial equality" and "adequacy" of resources for children in all communities; the pro-rata reduction of 1991 operations aid regardless of need had resulted in a "disparately greater reduction to poor communities"; the regionalization bonuses were not determined by an educational rationale and were improper; the minimum-operations-aid-share provision "benefit[ed] wealthy districts" and was improper; the school housing aid "provide[d] additional reimbursement to the wealthier communities at the expense of the poorer districts"; the special-education funding program exacerbated resource disparities; the state failed to ensure that differences in funding were based upon factors relevant to education; the reduction of additional reimbursements to districts educating students of limited English proficiency had a disparate financial

impact on plaintiffs' districts in 1992; poor districts had high concentrations of students with special needs, yet they were afforded less financial assistance by the state; and educational indicators such as standardized test scores were positively correlated to district wealth.

After finding that "[s]tudents in the plaintiff districts do not have educational opportunities equal to those in the wealthier districts," the trial justice determined that "[r]egardless of whether the level of scrutiny is strict, intermediate or rational basis, there is no state interest advanced which justifies a school financing system in which educational opportunities available to a child are determined by the taxable wealth of the child's school district."

On those bases, the trial justice ruled that the state's public school financing system violated the education clause, as well as the equal-protection and the due-process guarantees of the State Constitution. The Superior Court ordered defendants to "proceed with all deliberate speed to formulate and establish a system of public school finance which complies with [the court's decision and judgment]." In addition, the trial justice retained jurisdiction of the case for the purpose of enforcing the judgment.

## Analysis

### A. The Education Clause

■ The Superior Court justice reached the following conclusion:

"The Court determines and declares that the language of Article XII of the Rhode Island Constitution and the relevant constitutional history demonstrate that there is a fundamental and constitutional right for each child to an opportunity to receive an education in Rhode Island. The opportunity to receive an education is a right which each child has as a resident of Rhode Island, regardless of where he lives, and that right is to an opportunity to receive an equal, adequate, and meaningful education."

As we have pointed out *supra*, the plain language and the history of article 12 dictate that such a conclusion is clearly wrong. The education clause confers no such right, nor does it guarantee an "equal, adequate, and meaningful education." In addition to contradicting the historical record and the express language of article 12, the judgment fails to recognize the role of the Judiciary in our tripartite system of government. By retaining jurisdiction for purposes of enforcement, the Superior Court self-imposed a role in this state's educational system far beyond the Judiciary's constitutional powers or institutional capacity.

The historical context of article 12, section 1, both in the 1842 Constitution and in the 1986 Constitution that continued its policies, compels the conclusion that the education clause did not intend to guarantee an "equal, adequate, and meaningful" education because both at the time article 12 was adopted and for decades afterward, there was no requirement that public education be provided at all in this state. Carroll, ch. IV at 145 and ch. V at 202. Actually, plaintiffs' expert testified that at the time of its adoption, article 12 was not read as requiring there be schools in every locality, scarcely a mandate for equity.

Addressing the specific language of article 12, section 1, the trial justice stated:

"The Constitution imposes the duty upon the General Assembly to promote public schools. Webster's Dictionary, at the time of the adoption of Article XII, and even today, provides that a synonym for the word, 'promote', is the word, 'found.' The term, 'promote', at that time was also used in many instances to mean establish. There is a similarity in the use of this language to the Jeffersonian use of the language that schools be provided and that they be available on an equitable basis and that those schools, when established have a meaningful purpose." [7]

7. Jefferson's views on education were in fact more elitist than egalitarian inasmuch as "Thomas Jefferson believed as truly in a 'natural aristocracy' as did John Adams." John Dewey, *Freedom and Culture* 63 (1939). Jefferson saw education as benefiting primarily those who had the capacity to benefit most by it:

"I do most anxiously wish to see the highest degrees of education given to the higher degrees of genius, and to all degrees of it, so

Published in 1828, Noah Webster's American Dictionary of the English Language, vol. II (1828) contained the following definition of "Promote":

"Promo'te, *v.t.* [L. *promotus, promoveo,* to move forward; *pro* and *moveo,* to move; It. *promovere;* Sp. *promover;* Fr. *promouvoir.*]

1. To forward; to advance; to contribute to the growth, enlargement or excellence of any thing valuable, or to the increase of any thing evil; as, to *promote* learning, knowledge, virtue or religion; to *promote* the interests of commerce or agriculture; to *promote* the arts; to *promote* civilization or refinement; to *promote* the propagation of the gospel; to *promote* vice and disorder.

2. To excite; as, to *promote* mutiny.

3. To exalt; to elevate; to raise; to prefer in rank or honor."

The modern definition of the word is remarkably similar:

"pro mote * * * [L. *promotus,* pp. of *promovere,* to move forward; *pro,* forward, and *movere,* to move.]

1. to forward; to advance; to contribute to the growth, enlargement, or excellence of.

It is the duty of all ranks to *promote* the means of education.—John Adams.

2. to exalt; to elevate; to raise; to prefer in rank or honor; as, *promoted* to a foremanship.

3. to work actively and stir up interest for the accomplishment of (something); as, *promote* a new law.

4. in education, to move forward a grade in school.

5. to inform against. [Obs.]

Syn.—advance, encourage, forward, prefer, organize, equip." Webster's New Universal Unabridged Dictionary 1440 (2d ed. 1983).

Hence, the word "promote" in article 12, section 1, does not mean "found" or "establish." The meaning of the word in its historical context clearly precludes such a definition, first, because the towns themselves "founded" or "established" their public schools, not the General Assembly, and, second, because the State Constitution of 1842 did not require the founding or establishing of a public school in every town. The historical evidence demonstrates that since the time article 12 was adopted, the establishment of schools has been left to the local communities although financial and other assistance were provided by the state.

As for the remaining language of article 12, as we noted *ante,* a more comprehensive or discretionary grant of power is difficult to envision. Article 12, section 1, refers to "all means which *it* [the General Assembly] may deem necessary and proper to secure to the people the advantages and opportunities of education." (Emphasis added.) No standard or authority has been assigned to a coordinate branch of government to review the General Assembly's performance in fulfillment of its constitutional duties in this regard. The education clause leaves all such determinations to the General Assembly's broad discretion to adopt the means *it* deems "necessary and proper" in complying with the constitutional directive.

The past decisions of this court support such a view. Twice recently we have referred to the General Assembly's power over public school interests as "plenary." *See Pawtucket School Committee v. Pawtucket Teachers Alliance,* 610 A.2d 1104, 1105 (R.I. 1992); *Greenhalgh v. City Council of Cranston,* 603 A.2d 1090, 1093 (R.I.1992). Moreover, this court has consistently held that

---

much as may enable them to read & understand what is going on in the world, and to keep their part of it going on right: for nothing can keep it right but their own vigilant & distrustful superintendence." Letter from Thomas Jefferson to Mann Page (Aug. 30, 1795), in Thomas Jefferson Writings, at 1030 (Merrill D. Peterson ed. 1984).

Furthermore, Jefferson envisioned two distinct educational systems, based in part on wealth:

"It is highly interesting to our country, and it is the duty of its functionaries, to provide that every citizen in it should receive an education proportioned to the condition and pursuits of his life. The mass of our citizens may be divided into two classes—the laboring and the learned." Letter from Thomas Jefferson to Peter Carr (Sept. 7, 1814), in *id.* at 1348.

article 12 vests in the General Assembly *sole* responsibility in the field of education. *Brown v. Elston,* 445 A.2d 279, 285 (R.I. 1982); *Chang v. University of Rhode Island,* 118 R.I. 631, 639–40, 375 A.2d 925, 929 (1977); *see also National Education Association of Rhode Island v. Garrahy,* 598 F.Supp. 1374, 1387 (D.R.I.1984) ("[i]t is beyond gainsaying that under state law, the state exercises supreme responsibility in the arena of education. *See* R.I. Const. Art. XII").

The plaintiffs quoted extensively from our decision in *School Committee of Westerly v. Westerly Teachers Association,* 111 R.I. 96, 299 A.2d 441 (1973), and claimed that this court "has consistently found education to be a fundamental right under The Rhode Island Constitution."

> "The diffusion of knowledge through the use of the public school system so that the advantages and opportunities afforded by education will be made available to the people is the constitutional responsibility of the state. Article XII, sec. 1 of the Rhode Island constitution. This responsibility is carried on at the local level by the school committee as an agent of the state.
>
> "The state has a compelling interest that one of its most precious assets—its youth—have the opportunity to drink at the font of knowledge so that they may be nurtured and develop into the responsible citizens of tomorrow. No one has the right to turn off the fountain's spigot and keep it in a closed position." *Id.* at 99–100, 299 A.2d at 443–44.

The plaintiffs have read *Westerly Teachers* too broadly, however. That case dealt with the claim by public school teachers of a right to strike. *Westerly Teachers,* 111 R.I. at 97–98, 299 A.2d at 442–43. The excerpt above accurately reflected the court's view at the time that a strike by teachers was illegal. *Westerly Teachers* stands for the proposition that outside forces may not interfere with the education of Rhode Island's youth. It does not cite any restrictions on the General Assembly's constitutionally assigned duty to promote public education in Rhode Island.

The plaintiffs also cited dicta from *Exeter–West Greenwich Regional School District v.* *Exeter–West Greenwich Teachers' Association,* 489 A.2d 1010, 1016 (R.I.1985), where this court stated, "The right to an education in Rhode Island is recognized and guaranteed in article XII, section 1, of the Rhode Island Constitution." We concur with plaintiffs that the right to an education is a constitutional right in this state, but we stress that article 12 assigns to the General Assembly the responsibility for that right. The plaintiffs have not persuaded us that this right was not capable of enforcement through the General Assembly's plenary powers in educational matters. Because the Legislature is endowed with virtually unreviewable discretion in this area, plaintiffs should seek their remedy in that forum rather than in the courts.

This court unhesitatingly acknowledges that "education is perhaps the most important function of state and local governments," *Brown v. Board of Education,* 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873, 880 (1954). Nevertheless, the analysis of the complex and elusive relationship between funding and "learner outcomes," when all other variables are held constant, is the responsibility of the Legislature, which has been delegated the constitutional authority to assign resources to education and to competing state needs.

On the basis of the record before us, we cannot conclude that the General Assembly has violated its constitutional mandate to support and promote education so as to warrant a judicial response. We decline to speculate on the omens that would presage a constitutional violation. We conclude only that plaintiffs have not presented such a case.

### B. Separation of Powers

Notwithstanding our personal dedication to education and our appreciation of its significance in the lives of people of all ages, it is clearly our duty to determine the law, not to make the law. *United States v. Nixon,* 418 U.S. 683, 703, 94 S.Ct. 3090, 3105, 41 L.Ed.2d 1039, 1061 (1974). We have held *ante* that the task of designing a system of financing public education has been delegated to the

General Assembly under article 12, not to the courts. Consequently, we refrain from scaling the walls that separate law making from judging, for "[w]ere the power of judging joined with the legislative * * * *the judge* would then be *the legislator.*" The Federalist Papers, No. 47 at 303 (James Madison) (Clinton Rossiter ed., 1961). "[S]o long as the judiciary remains truly distinct from both the legislature and the executive * * * the general liberty of the people can never be endangered from that quarter." The Federalist Papers, No. 78 at 466 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

■ After reviewing cases of the United States Supreme Court on the separation of powers, Justice Powell concluded: "Functionally, the doctrine may be violated in two ways. One branch may interfere impermissibly with the other's performance of its constitutionally assigned function. * * * Alternatively, the doctrine may be violated when one branch assumes a function that more properly is entrusted to another." *I.N.S. v. Chadha,* 462 U.S. 919, 963, 103 S.Ct. 2764, 2790, 77 L.Ed.2d 317, 352 (1983) (Powell, J., concurring). In the case before us, plaintiffs have urged that we do both. First, they urged us to interfere with the plenary constitutional power of the General Assembly in education. Second, by urging that we order "equity" in funding sufficient to "achieve learner outcomes," plaintiffs have asked that the court take on a responsibility explicitly committed to the Legislature.

■ Moreover, plaintiffs have asked the judicial branch to enforce policies for which there are no judicially manageable standards. Absent such standards, we must determine whether the case is justiciable: "First, we must decide whether the claim presented and the relief sought are of the type which admit of judicial resolution. Second, we must determine whether * * * the issue presented [is] a 'political question'—that is, a question which is not justiciable in * * * court because of the separation of powers provided by the Constitution." *Powell v. McCormack,* 395 U.S. 486, 516–17, 89 S.Ct. 1944, 1961, 23 L.Ed.2d 491, 514 (1969). Such a determination requires a case-by-case analysis of the relationship between the branches. "Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of [a court] as [the] ultimate interpreter of the Constitution." *Baker v. Carr,* 369 U.S. 186, 211, 82 S.Ct. 691, 706, 7 L.Ed.2d 663, 682 (1962).

The plaintiffs have asked that the court create judicially enforceable standards under article 12, section 1, and thereby disregard these considerations. The trial justice implicitly acknowledged the absence of judicially discoverable and manageable standards for resolving these issues. Clearly article 12, section 1, provides none. Faced with this absence of standards, the trial justice adopted one: the right to receive an "equal, adequate, and meaningful education," a standard that is not susceptible of judicial management. What constitutes an appropriate education or even an "equal, adequate, and meaningful" one, "is not likely to be divined for all time even by the scholars who now so earnestly debate the issues." *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 43, 93 S.Ct. 1278, 1302, 36 L.Ed.2d 16, 49 (1973). Because we believe the proper forum for this deliberation is the General Assembly, not the courtroom, we decline to endorse the trial justice's plan that requires the people of this state

"to turn over to a tribunal against which they have little if any recourse, a matter of such grave concern to them and upon which they hold so many strong, though conflicting views. If their legislators pass laws with which they disagree or refuse to act when the people think they should, they can make their dissatisfaction known at the polls. * * * The court, however, is not so easy to reach * * * nor is it so easy to persuade that its judgment ought to be revised." *Seattle School District No. 1 of King County v. State,* 90 Wash.2d 476, 563–64, 585 P.2d 71, 120 (1978) (Rosellini, J., dissenting).

In recognizing the importance of the doctrine of separation of powers to our form of constitutional government, Justice Brandeis said:

"The doctrine of the separation of powers was adopted by the [Federal Constitutional] Convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was, not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy." *Myers v. United States,* 272 U.S. 52, 293, 47 S.Ct. 21, 85, 71 L.Ed. 160, 242–43 (1926) (Brandeis, J., dissenting).

We concur with that opinion and also with the conclusion that

"[I]t is not within the power or province of members of the Judiciary to advance their own personal wishes or to implement their own personal notions of fairness under the guise of constitutional interpretation. The quantity and quality of educational opportunities to be made available to the State's public school children is a determination committed to the legislature or to the people * * * through adoption of an appropriate amendment to the State Constitution." *Hornbeck v. Somerset County Board of Education,* 295 Md. 597, 658–59, 458 A.2d 758, 790 (1983).

This court fully recognizes that it is "the province and duty of the judicial department to say what the law is." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60, 73 (1803). Our emphasis on the distinct roles of the branches does not imply that we would ignore that "[w]hile the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153, 1199 (1952) (Jackson, J., concurring); *see Dreyer v. Illinois,* 187 U.S. 71, 84, 23 S.Ct. 28, 32, 47 L.Ed. 79, 85 (1902). The judgment of the Superior Court provides neither interdependence nor reciprocity and must be rejected.

We point out one additional caveat: the absence of justiciable standards could engage the court in a morass comparable to the decades-long struggle of the Supreme Court of New Jersey that has attempted to define what constitutes the "thorough and efficient" education specified in that state's constitution. *See* Joshua S. Lichtenstein, *Abbott v. Burke: Reaffirming New Jersey's Constitutional Commitment to Equal Educational Opportunity,* 20 Hofstra L.Rev. 429, 437 (1991). Beginning with *Robinson v. Cahill,* 62 N.J. 473, 303 A.2d 273 (1973), and continuing with *Robinson v. Cahill,* 63 N.J. 196, 306 A.2d 65 (1973); *Robinson v. Cahill,* 67 N.J. 35, 335 A.2d 6 (1975); *Robinson v. Cahill,* 67 N.J. 333, 339 A.2d 193 (1975); *Robinson v. Cahill,* 69 N.J. 133, 351 A.2d 713 (1975); *Robinson v. Cahill,* 69 N.J. 449, 355 A.2d 129 (1976); *Robinson v. Cahill,* 70 N.J. 155, 358 A.2d 457 (1976); *Robinson v. Cahill,* 70 N.J. 464, 360 A.2d 400 (1976); *Abbott v. Burke,* 100 N.J. 269, 495 A.2d 376 (1985); *Abbott v. Burke (Abbott II),* 119 N.J. 287, 575 A.2d 359 (1990); and *Abbott v. Burke,* 136 N.J. 444, 643 A.2d 575 (1994), the New Jersey Supreme Court has struggled in its self-appointed role as overseer of education for more than twenty-one years, consuming significant funds, fees, time, effort, and court attention. The volume of litigation and the extent of judicial oversight provide a chilling example of the thickets that can entrap a court that takes on the duties of a Legislature.

Another long-standing imbroglio involving school funding was recently terminated by the United States Supreme Court when it held that the State of Missouri could no longer be required to sustain the funding of "quality education programs" designed to remedy the vestiges of segregation. *Missouri v. Jenkins,* —— U.S. ——, ——, 115 S.Ct. 2038, 2055, 132 L.Ed.2d 63 (1995). Writing in concurrence, Justice O'Connor pointed out the constitutional restrictions that "limit the judiciary's institutional capacity to prescribe palliatives for societal ills." *Id.* at ——, 115 S.Ct. at 2061 (O'Connor, J., concurring).

## C. Equal Protection Analysis

The plaintiffs have urged this court to affirm the Superior Court's ruling that the state's public school financing system violates the equal-protection and due-process guaran-

tees of the Constitution of Rhode Island. The defendants countered that efforts by the Legislature to equalize educational opportunities for all children in the state have largely been successful and that the financing system is rationally related to a legitimate state interest. We concur with defendants' position.

As we have pointed out *supra*, it is well settled that legislative enactments of the General Assembly are presumed to be valid and constitutional, *Kass*, 567 A.2d at 360 (citing *In re Advisory Opinion to the House of Representatives*, 485 A.2d 550, 552 (R.I. 1984)), and "the party challenging the constitutional validity of an act carries the burden of persuading the court beyond a reasonable doubt that the act violates an identifiable aspect of the * * * constitution." *Kennedy*, 654 A.2d at 712 (citing *Brennan v. Kirby*, 529 A.2d 633, 639 (R.I.1987)). With these principles in mind, we begin the analysis of the equal-protection challenge.

 The constitution of this state provides that "[n]o person shall be deprived of life, liberty or property without due process of law, nor shall any person be denied equal protection of the laws." Article 1, section 2. In determining the proper standard of review of a putatively unconstitutional statute, we must examine both the nature of the classification established by the legislation and the individual rights that may be infringed upon by the legislation. *Kennedy*, 654 A.2d at 712. If the legislation involves neither a fundamental right nor a suspect classification, the appropriate standard of review is minimal scrutiny, which requires that the legislative classification be "rationally related to a legitimate state interest." *Id.* (quoting *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511, 517 (1976)(per curiam)).

 The plaintiffs argued that the public school financing system violates the equal-protection clause because children in the poorer school districts do not receive as well funded an education as do children from wealthier districts. In other words, plaintiffs have alleged that their right to education has been compromised because of their districts' diminished financial ability. The United

States Supreme Court has long held that the right to an education is a not a fundamental right afforded protection under the Federal Constitution, *Rodriguez*, 411 U.S. at 35, 93 S.Ct. at 1297, 36 L.Ed.2d at 44, and as discussed *supra*, education is not generally a judicially-enforceable right under article 12, section 1, of our State Constitution. Moreover, wealth is not a suspect classification for purposes of an equal-protection analysis. *Maher v. Roe*, 432 U.S. 464, 471, 97 S.Ct. 2376, 2381, 53 L.Ed.2d 484, 492–93 (1977). Therefore, the proper standard of review by this court is minimal scrutiny.

 We first examine the alleged disparities in the funding of school districts in Rhode Island. At trial, the Superior Court excluded evidence offered by defendants on the national ranking of Rhode Island in terms of its funding of education and in terms of the degree of disparity among various districts on the ground that the evidence was irrelevant. We are of the opinion that such evidence not only is relevant, but is necessary to provide a factual context within which a meaningful evaluation of the arguments and allegations of both parties can take place.

Among the voluminous record and information submitted by the parties, two comparisons were of particular interest and significance: the per-pupil expenditure in Rhode Island compared to that of other states and, more importantly, Rhode Island's expenditure ratio between the high-spending districts and the low-spending districts compared to that of other states. Specifically, during the 1989–1990 school year, Rhode Island's average expenditure per pupil ranked sixth highest in the nation after adjusting for cost-of-living differences. In addition to the high per-pupil expenditure relative to other states in the country, Rhode Island has been found to do a better job at equalizing the funding of local school districts than most other states. *See Middletown School Committee v. Board of Regents for Education*, 439 F.Supp. 1122, 1123 n. 3 (D.R.I.1977). According to a survey conducted by the Congressional Research Service of the Library of Congress on variations in school expenditure,

in the 1989–1990 school year, of the fifty states and the District of Columbia, only Hawaii and the District of Columbia had a more equalized per-pupil expenditure than Rhode Island.[8] Wayne C. Riddle and Liane White, *Variations in Expenditures Per Pupil Among Local Educational Agencies Within the States* 6–10 (July 26, 1993).

It is noteworthy that these comparisons were calculated prior to the Legislature's efforts since 1992, described *supra*, that further equalized state funding by removing disequalizing factors in the operations-aid formula and by funding special-aid programs to assist poorer communities. Although our observations should not be construed as an endorsement by this court of the status quo, the current funding disparities do not support a constitutional challenge. We are of the opinion that the General Assembly has made a sufficient and rational effort in funding education such that judicial oversight is not warranted.

In considering the adequacy of state funding, this court is cognizant of the fact that, compared to the nation as a whole, the State of Rhode Island funds a smaller portion of the cost of education than do most states.[9] Indeed, the New England states historically have been more dependent than other states on property taxes to finance local government services, including education, and Rhode Island's share of educational costs is comparable to that of the other New England states. 21st C. Commission Report at VIII–31–33. In fact, in fiscal 1993, only two New England states funded a larger state share of local educational costs than Rhode Island funded. Rhode Island Public Expenditure Council, *How Rhode Island Schools Compare: Public Elementary and Secondary Education Rankings* (1994 ed.).

▮ In its decision, the Superior Court adopted the definition of "equity" as it appeared in the 21st C. Commission Report.

Because "[c]onstitutions are designed to afford *minimum* protections to society," a judicially imposed notion of equity is warranted only when the Legislature has failed to meet that minimum level of equity as mandated by the constitution. *McDaniel v. Thomas*, 248 Ga. 632, 648, 285 S.E.2d 156, 168 (1981). Although we would encourage additional state funding for public education, this court concludes that the current financing system is rationally related to legitimate state interests such as balancing competing needs and encouraging local participation in education. *See post.*

We are particularly troubled by a definition of "equity" that requires "a sufficient amount of money * * * [to be] allocated to enable all students to achieve learner outcomes." As observed by the United States Supreme Court in *Jenkins*, —— U.S. at ——, 115 S.Ct. at 2056, "numerous external factors beyond the control of the [school district] and the State affect * * * student achievement." The school district at issue in *Jenkins* illustrates that money alone may never be sufficient to bring about "learner outcomes" in all students. In *Jenkins*, massive expenditures have provided the Kansas City, Missouri, school district with "facilities and opportunities not available anywhere else in the country," yet the school district was "still at or below national norms at many grade levels." *Id.* at ——–——, 115 S.Ct. at 2045–46. This outcome illustrates the inherent risks of a judicially imposed constitutional mandate that requires equity in funding contingent on "learner outcomes." Therefore, we are of the opinion that the adoption of such a definition of "equity" is the prerogative of the Legislature, not of the courts.

▮ Under the minimal-scrutiny standard of review, a funding system must be upheld if it is rationally related to a legitimate state interest. The defendants assert-

---

8. The comparison is based on the ratio of the per–pupil expenditure in the high–spending districts to the per–pupil expenditure in the low–spending districts. Specifically, the ratio is computed by dividing the per–pupil expenditure in the districts at the 95th percentile by the average per–pupil expenditure in the districts at the 5th percentile.

9. In the year 1993–1994, forty-one states had a larger portion of their expenditures for public elementary and secondary schools funded by their state governments than was funded by Rhode Island. Rhode Island Public Expenditure Council, *How Rhode Island Schools Compare: Public Elementary and Secondary Education Rankings* (1994 ed.).

ed that the preservation of local control over education is a legitimate state interest, and we agree. The United States Supreme Court has recognized that "[n]o single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process." *Milliken v. Bradley*, 418 U.S. 717, 741–42, 94 S.Ct. 3112, 3125–26, 41 L.Ed.2d 1069, 1089 (1974).

The public school financing system in Rhode Island relies substantially on local property taxation to fund public schools and permits districts to increase their expenditures for education if the districts so choose. We hold that the preservation of local control is a legitimate state interest and that the current financing system is rationally related to that legitimate interest.

Under the Rhode Island Constitution, the level of state educational funding is largely a matter for the Legislature, which possesses the "expertise and familiarity with local problems implicated in the raising and disposition of public revenues associated with public education." *Hornbeck v. Somerset County Board of Education*, 295 Md. 597, 651, 458 A.2d 758, 786 (1983); *accord School Administrative District No. 1 v. Commissioner, Department of Education*, 659 A.2d 854 (Me. 1995). Accordingly, it is our opinion that the public school financing system in Rhode Island does not violate the equal-protection clause of the State Constitution.

### Conclusions

This court fully appreciates that the advantages and opportunities of education are essential to the preservation of our rights and liberties and to the exercise of the freedoms guaranteed under our Federal and State Constitutions. And for those children at risk, education provides the surest means to a better life.

We know that children in poverty "live in a culture where schools, studying, and homework are secondary. Their test scores, their dropout rate, their attendance at college, all indicate a severe failure of education. While education is largely absent from their lives, we get some idea of what is present from the crime rate, disease rate, drug addiction rate, teenage pregnancy rate and the unemployment rate." *Abbott II*, 119 N.J. at 391, 575 A.2d at 411.

As an increasing proportion of our population becomes isolated in a separate culture and becomes increasingly undereducated, the resulting disintegration cannot but threaten the fundamental principles upon which our governments were established. *See id.* at 392–93, 575 A.2d at 412.

Fully aware of the fundamental role of education in ensuring the common aspirations of a cohesive society and respecting the role of knowledge and virtue in that society, the framers of our state's constitution clearly charged the General Assembly with the duty to promote public schools and "to adopt all means which it may deem necessary and proper to secure to the people the advantages and opportunities of education." Article 12, section 1. We are hard pressed to conceive of a more explicit delegation of responsibility to a branch of government. Article 1, section 1 of the Constitution of Rhode Island explicitly declares that " 'the basis of our political systems is the right of the people to *make and alter* their constitutions.' " (Emphasis added.) Because article 12 has not been changed with respect to education "by an explicit and authentic act of the whole people, [article 12] is sacredly obligatory upon all." *Id.*

Members of the legislative and executive branches are directly accountable to the electorate, and such responsibilities as the allocation of property tax burdens and general state levies are best dealt with through the political process, incorporating informed decisions at the state and local levels. "In such a complex arena in which no perfect alternatives exist, the Court does well not to impose too rigorous a standard of scrutiny lest all local fiscal schemes become subjects of criticism under the Equal Protection Clause." *Rodriguez*, 411 U.S. at 41, 93 S.Ct. at 1301, 36 L.Ed.2d at 48. For example, the United States Supreme Court has cautioned that if local property taxation were found to be an unconstitutional source of funding for edu-

cation, then that same local property tax might be an equally impermissible means to fund other services such as local police and fire protection. *Id.* at 54, 93 S.Ct. at 1307, 36 L.Ed.2d at 55.

The recent changes to the operations-aid formula, some enacted after the conclusion of proceedings in the Superior Court, have removed factors that contributed to some inequities in the state's major funding program. In consequence, a funding process that already ranked among the country's most equitable programs has become even more so.

The plaintiffs have pointed out that some districts do not offer a variety of elective courses. It is, however, the academic achievement in basic core subjects—reading, mathematics, and writing—that represents the key challenge in education. Because these subjects are required components of the state's basic-education program, these subjects are taught in all schools irrespective of district wealth. Recent studies have indicated that educational achievement by students is most clearly a function of parental involvement,[10] not necessarily increased spending. Because, for example, expenditures for noneducational services have begun to exceed those for academic studies and because huge expenditures do not necessarily result in improved educational achievement, *see Jenkins, supra,* we are led to conclude that a complex problem involving the allocation of statewide resources is not a proper arena for judicial determination. Rather, the legislative and the executive offices have the responsibility to allocate limited and often scarce resources among the virtually unlimited needs and demands not only to support education but also to care for the sick, to support the poor, to maintain our highways, to provide for the safety of our citizens, and numerous other demands. A judge accustomed to the constraints implicit in adversary litigation cannot feasibly by judicial mandate interfere with this delicate balance without creating chaos.

In summary, then, we reject the arguments advanced by the plaintiffs and the conclusions made by the trial court.

Therefore, in respect to case No. 199–A., we sustain the appeal and reverse the order of the trial justice denying intervention.

In case No. 94–188–M.P., we grant the petition for certiorari and quash the judgment of the Superior Court.

In case No. 94–203–M.P., we grant the petition for certiorari and quash the judgment of the Superior Court.

In case No. 94–347–A., we sustain the appeal and reverse the judgment of the Superior Court.

The papers in the case may be remanded to the Superior Court with our decision endorsed thereon and with directions to enter judgment for the defendants.

BOURCIER, J., did not participate.

---

**10.** *See, e.g.,* Susan McAllister Swap, *Developing Home–School Partnerships* (Teachers College, Columbia University 1993).